## JOSEPH M. SEGEL AND DORIS G. SEGEL, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 14330-85, 17211-85, 17212-85, 17213-85, 17214-85.

Filed October 21, 1987.

---

[1]Cases of the following petitioners are consolidated herewith: Alan J. Segel, docket No. 17211-85; Marvin L. and Rhonda P. Segel, docket No. 17212-85; Fannie B. Segel, docket No. 17213-85; and Michael D. and Sandy Stern, docket No. 17214-85.

*Mark S. Blaskey, Bennett G. Picker,* and *Peter R. Spirgel,* for the petitioners.

*Eugene J. Wein* and *James P. Clancy,* for the respondent.

WELLS, *Judge*: By statutory notices of deficiency, respondent determined deficiencies in petitioners' income taxes for the taxable years as follows:

| Docket no. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 14330-85 | Joseph M. and | 1972 | $29,363.00 |
| | Doris G. Segel | 1974 | 40,570.00 |
| | | 1975 | 56,080.00 |
| | | 1977 | 5,832.00 |
| | | 1978 | 171,562.00 |
| 17211-85 | Alan J. Segel | 1972 | 7,497.55 |
| | | 1973 | 17,238.73 |
| | | 1975 | 5,677.00 |
| | | 1978 | 22,082.00 |
| 17212-85 | Marvin L. Segel | 1972 | 3,172.52 |
| | | 1974 | 30,371.00 |
| | | 1975 | 9,526.00 |
| | Marvin L. and | 1977 | 1,550.00 |
| | Rhonda P. Segel[2] | 1978 | 57,234.00 |
| 17213-85 | Fannie B. Segel | 1975 | 31.00 |
| | | 1977 | 310.00 |
| | | 1978 | 11,119.00 |
| | | 1979[3] | 67.00 |
| 17214-85 | Michael D. and | 1978 | 25,402.00 |
| | Sandy Stern | | |

The issues for decision are (1) whether funds paid by petitioners to Presidential Airways Corp., a subchapter S corporation (hereinafter Presidential), at the time Presidential was established and from time to time thereafter, should be regarded as equity investments rather than loans for Federal income tax purposes; (2) if the payments are loans, whether petitioners recognized taxable income in 1977 and 1978 as a result of distributions they received in those years from Presidential; and (3) whether investment tax credits must be recaptured in full in 1977 and 1978, even though the use of the credits caused the imposition of an increased minimum tax in the years the investment tax credits were used.

### GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits thereto are incorporated herein by reference.

---

[2]Rhonda Segel is a petitioner only because she filed a joint return with Marvin Segel in 1977 and 1978.

[3]Respondent issued a statutory notice of deficiency for 1979 only to petitioner Fannie Segel. At trial, respondent conceded all deficiencies against Fannie Segel for 1979, thus removing all issues relating to the 1979 tax year from consideration in this case.

Petitioners Joseph M. and Doris G. Segel are husband and wife who resided in Merion, Pennsylvania, at the time they filed their petition. They filed joint Federal income tax returns for the taxable years 1972, 1974, 1975, 1977, and 1978.

Petitioner Joseph Segel holds a bachelor of science degree from the Wharton School of Business Administration of the University of Pennsylvania. His major was marketing. He also attended graduate business school at Wharton for 2 years, but did not receive a degree because he never wrote his thesis.

Petitioner Joseph Segel is an experienced, knowledgeable businessman and has been involved with several business ventures, one of which traded under the name "Franklin Mint." He founded Franklin Mint in 1964, was responsible for taking the company public shortly thereafter, and retired from his position as chairman of the board in 1973. After retiring from Franklin Mint, Joseph Segel was involved primarily in public service work with the United Nations as Chairman of the Board of Governors of the United Nations Association of the United States and as a Presidential appointee to the U.S. delegation to the United Nations General Assembly.

Petitioner Alan J. Segel resided in Merion, Pennsylvania, at the time he filed his petition. Petitioner Alan Segel is the son of petitioners Joseph and Doris Segel.

Petitioners Marvin L. and Rhonda P. Segel were husband and wife who resided in Cherry Hill, New Jersey, at the time they filed their petition. They filed joint Federal income tax returns for 1977 and 1978. Petitioner Marvin Segel filed Federal income tax returns as a single individual for the years 1972, 1974, and 1975. Petitioner Marvin Segel is the son of petitioner Joseph Segel.

Petitioner Fannie B. Segel resided in Philadelphia Pennsylvania, at the time she filed her petition. Petitioner Fannie Segel is the mother of petitioner Joseph Segel.

Petitioners Michael D. and Sandy Stern are husband and wife who resided in Wynnewood, Pennsylvania, at the time they filed their petition. They filed a joint Federal income tax return for 1978. Petitioner Sandy Stern is the daughter

of petitioner Doris Segel and the stepdaughter of petitioner Joseph Segel.

Respondent issued a statutory notice of deficiency to each of the petitioners setting forth determined deficiencies in income tax liability for the years and in the amounts shown above.

Presidential was organized under the laws of Pennsylvania on or about September 2, 1975. It was established to operate a new charter aircraft service to serve the eastern seaboard.

On or about September 11, 1975, the following individuals (hereinafter the shareholders) acquired the following interests in Presidential: Joseph Segel, 15 shares, or 30 percent; Doris Segel, 15 shares, or 30 percent; Marvin Segel, 10 shares, or 20 percent; Sandy Stern, 4 shares or 8 percent; Joseph Segel, custodian for Alan Segel, 4 shares, or 8 percent; and Fannie Segel, 2 shares, or 4 percent.

Petitioner Joseph Segel was chairman of the board and president of Presidential from its inception in September of 1975 until petitioners later sold all their interests in Presidential.

On or about September 11, 1975, Presidential filed a valid election to be treated as a small business corporation under subchapter S of the Internal Revenue Code.[4]

On or about September 18, 1975, the following petitioners[5] made the following payments to acquire their respective stock interests in Presidential (hereinafter referred to as the initial capitalization):

| | |
|---|---:|
| Joseph M. Segel | $360,000 |
| Doris G. Segel | 360,000 |
| Marvin L. Segel | 240,000 |
| Sandy Stern | 96,000 |
| Alan J. Segel | 96,000 |
| Fannie B. Segel | 48,000 |
| Total | 1,200,000 |

---

[4]Unless otherwise provided, all section and Code references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[5]These petitioners were all shareholders in Presidential. Petitioners Rhonda Segel and Michael Stern are petitioners only as a result of the filing of joint returns. The term "petitioners" as used herein refers generally to those petitioners who were shareholders in Presidential.

Also on or about September 18, 1975, the shareholders made additional transfers of funds to Presidential in the aggregate amount of $2,035,000 in direct proportion to their stock interests. The shareholders made further transfers of funds to Presidential in proportion to their stockholdings in the following aggregate amounts:

| Dec. 19— | Amount |
|---|---|
| 1975 | $2,220,000 |
| 1976 | 1,675,000 |
| 1977 | 646,000 |
| 1978 | 435,000 |

(The foregoing transfers of funds to Presidential in excess of the initial capitalization are hereinafter referred to as the payments.)

There was no written agreement between Presidential and the shareholders to evidence Presidential's intent to repay the payments, or to evidence any expectation of the shareholders that Presidential would repay the payments in any fixed manner or at any fixed date.

The shareholders received no security for the payments.

Presidential never paid interest to the shareholders with respect to the payments.

Presidential filed a Small Business Corporation Income Tax Return, Form 1120S, for the period September 11, 1975, through December 31, 1975, and for calendar year periods 1976, 1977, and 1978. All four returns showed a loss for Presidential. Presidential's losses for such years were allocated to the shareholders and reported on the shareholders' individual income tax returns in accordance with their ownership interests in Presidential. Presidential's losses were as follows:

| Period | Loss |
|---|---|
| Sept. - Dec. 1975 | $915,960 |
| 1976 | 2,182,386 |
| 1977 | [6]1,013,716 |
| 1978 | 5,640 |

Eventually the shareholders of Presidential decided to sell some of Presidential's assets. Presidential distributed a portion of the sales proceeds to the shareholders in propor-

---

[6]The return showed a net loss of $1,016,118; however, Presidential and respondent agreed after an income tax audit of Presidential that the loss was $1,013,716.

tion to their interests in Presidential. Presidential distributed $2,305,359 to the shareholders in 1977, and $961,000 in 1978.

From September 11, 1975, through December 31, 1978, the shareholders' transfers to Presidential totaled $8,211,000 in the aggregate ($7,011,000 of payments plus the $1,200,000 initial capitalization), and the distributions from Presidential totaled $3,266,359 in the aggregate. The shareholders reported on their individual income tax returns aggregate losses from Presidential of $4,117,702.

For convenience, our remaining findings of fact and opinion will be grouped together by the issues to which they relate.

## I. *Debt Equity*

### ADDITIONAL FINDINGS OF FACT

The income tax returns of Presidential were prepared by Merves & Co., certified public accountants. Petitioners' individual income tax returns for the years at issue were prepared by Merves & Co. or by Merves, Grossman, Brenner & Co., a predecessor firm to Merves & Co. Stanley Merves, a senior member of Merves & Co., has known petitioner Joseph Segel for about 45 years. Mr. Merves was also assistant treasurer of Presidential during the years at issue.

Presidential's Federal income tax returns for 1975 through 1978 listed "Capital Stock and Capital Surplus" in the amount of the initial capitalization (i.e., $1,200,000) on each respective Schedule L (balance sheets). The amount shown on each respective Schedule L as "Loans from Shareholders" was the total of the payments, less the distributions to the shareholders. Presidential's income tax returns were all signed by petitioner Joseph Segel, as president, and by Merves & Co., as preparer.

The payments were treated similarly on "Capital Stock/Franchise-Loans-Corporate Net Income Tax Report" filings with the Commonwealth of Pennsylvania for 1975, 1976, 1977, and 1978. Those returns also were signed by Joseph Segel, as Presidential president, and by Merves & Co., as preparer.

Presidential's general ledger also accounted for the payments in accounts titled "Loans from Shareholders." The distributions to the shareholders of $3,266,359 in 1977 and 1978 were debited to and decreased the "Loans from Shareholders" general ledger account.

No audited financial statements were prepared for Presidential for any of the years at issue. Merves & Co., or its predecessor, however, did prepare unaudited balance sheets. The balance sheets treated the payments inconsistently from year to year. The balance sheets characterized the initial capitalization and the payments (net of the distributions to the shareholders) as follows:

| Date of balance sheet | Loans from shareholders | Total stock and paid-in capital |
|---|---|---|
| 9/20/75 | $2,035,000 | $1,200,000 |
| 12/31/75 | 1,050,000 | 4,405,000 |
| 12/31/76 | 3,000,000 | 4,130,000 |
| 12/31/77 | - - - | 5,470,641 |

In connection with a proposed sale of the stock of Presidential, the shareholders unanimously adopted the following resolution dated October 1, 1979:

WE, THE UNDERSIGNED, being all of the shareholders of PRESIDENTIAL AIRWAYS CORPORATION, a Pennsylvania Corporation, do hereby consent in writing to the action taken in the following resolution:

WHEREAS, PRESIDENTIAL AIRWAYS CORPORATION, was organized on September 2, 1975 with a stated capital of $5,000.00 and paid in surplus of $1,195,000.00;

WHEREAS, the Shareholders of this Corporation have made loans to the Corporation, from time to time;

WHEREAS, said loans to the Corporation to date total $3,900,140.57;

WHEREAS, said loans are reflected on the books of the Corporation as debt obligation to the shareholders;

WHEREAS, the shareholders of this Corporation are desirous of contributing said loans to paid-in surplus;

NOW, THEREFORE, BE IT RESOLVED, that the shareholders of this Corporation do hereby contribute those various loans made to the Corporation from time to time in the amount of $3,900,140.57 to the paid-in surplus of said Corporation, and further direct that all necessary action be taken in order to effectuate such contributions on the books of the Corporation. [7]

---

[7]The shareholders continued to make additional payments to Presidential during 1979, but those payments do not affect the years at issue in the instant case.

The board of directors also unanimously passed a resolution that consented to the shareholders' resolution. Adjusting entries were made by Merves & Co. at that time to reflect the conversion of the "loans" to equity pursuant to the corporate resolutions.

On November 9, 1979, the shareholders entered into an agreement for the sale of their Presidential stock to Eric E. Glass for $240,000. The agreement and sales price took into account that certain assets of Presidential, which Mr. Glass did not wish to purchase, would be distributed to the shareholders. Adjusting journal entries were made by Merves & Co. shortly thereafter to reflect the withdrawal of those assets. The sale to Mr. Glass was consummated on November 30, 1979.

## OPINION

The first issue for our determination is whether the distributions are taxable to the shareholders. Respondent contends that even though there was no formal evidence of indebtedness, the payments constituted "loans" (as characterized by respondent) that were maintained on an open account basis.

Respondent bases his assertion on the fact that the payments were denominated as loans in filings with the Federal and State taxing authorities, in the corporation's books of account, in the corporate resolutions, and in some of the balance sheets prepared by Merves & Co. to reflect Presidential's financial position. Once Presidential's losses exceeded the initial capitalization, respondent argues that subsequent Presidential losses reduced the shareholders' bases in the loans. Presidential's cumulative losses surpassed $1,200,000 during 1976; thus, respondent asserts, petitioners were required to decrease their bases in the loans from 1976 onward. When repayments of the loans were made to the shareholders in 1977 and 1978, respondent asserts that the shareholders' respective bases in the loans were less than the face amounts of the loans because the Presidential losses should have been applied to decrease the shareholders' respective bases in the loans for tax purposes, but would not have decreased the face amounts of the loans actually owed by Presidential to the shareholders. As such,

under *Darby Investment Corp. v. Commissioner,* 37 T.C. 839 (1962), affd. per curiam 315 F.2d 551 (6th Cir. 1963), the shareholders received taxable income upon the repayment to them of loans where their bases in the loans were less than the face amounts of the loans. According to respondent, the portion of the repayments constituting income to each shareholder is a fraction, the numerator of which is the difference between the face amount of the loan and the respective shareholder's basis in the loan, and the denominator of which is the face amount of the loan.[8]

Respondent concedes that if the loans had been represented by formal evidence of indebtedness, the income received upon retirement of the loans would be considered as having been received in exchange for a capital asset pursuant to section 1232.[9] Respondent asserts, however, that because no evidence of indebtedness is present in the instant case, the income received upon repayment of the loans is ordinary in character.

Petitioners argue that all the payments must be considered equity and not debt; therefore, no income is recognized by the shareholders upon distributions to them because their bases in their Presidential stock were never reduced below zero.[10] If the payments must be characterized as debt, petitioners argue in the alternative that the distributions nevertheless do not constitute taxable income because (i) Presidential's obligation was speculative and repayment to the shareholders was in doubt; (ii) the economic reality of the investment is that the shareholders never realized any income from their investment in Presidential; or (iii) the policy behind subchapter S precludes the application of normal debt repayment rules to corporations electing to be

---

[8]We need not consider and do not address the correctness of respondent's statement of the law regarding repayments of loans that have bases less than their face amounts. Our disposition of this case on the debt-equity issue renders such an inquiry unnecessary.

[9]Sec. 1232 was repealed by the Deficit Reduction Act of 1984, effective for tax years ending after July 18, 1984.

[10]This argument presumes that the payments to the shareholders were not made out of Presidential's earnings and profits; payments out of earnings and profits would be taxable as dividends. See secs. 301 and 316. Presidential had losses for all of the years at issue, and respondent never asserted that Presidential ever had any earnings and profits; thus, we assume that Presidential had no earnings and profits from which it could pay a dividend. Therefore, any distributions from Presidential on its stock would reduce the shareholders' bases in their stock and would only be taxed to any shareholder to the extent that the value of the distributions received by any shareholder exceed that shareholder's basis in his or her stock. Sec. 301(c)(2) and (3).

taxed under the provisions of subchapter S where no arm's-length debtor-creditor relationship exists between the shareholders and the corporation. Petitioners' final contention is that if the payments must be characterized as debt and must be recognized as taxable income, the character of the income should be capital gain, not ordinary income, because it arose from the same "open transaction" that culminated in the sale of the shareholders' stock in 1979.

We first must determine whether the payments constitute debt or equity for Federal tax purposes. This is an often-litigated issue; however, the usual roles are reversed— respondent herein argues for debt classification. This different twist to the usual fact pattern, however, does not require us to apply different legal principles. See *Ragland Investment Co. v. Commissioner*, 52 T.C. 867, 875 (1969) (Court-reviewed), affd. per curiam 435 F.2d 118 (6th Cir. 1970).[11]

Unfortunately, there is no singular defined set of standards that has been uniformly applied in the debt-equity area. In the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, 613, sec. 415(a), Congress enacted section 385[12] as an attempt to pass to respondent the task of establishing uniform rules to define debt and equity. Section 385 authorizes respondent, as the delegate of the Secretary of Treasury, to prescribe regulations to define corporate stock and debt for all purposes of the Code and lists five factors

---

[11]See also *Inductotherm Industries, Inc. v. Commissioner*, T.C. Memo. 1984-281, affd. without published opinion 770 F.2d 1071 (3d Cir. 1985) (hereinafter cited as *Inductotherm*), and cases cited therein.

[12]SEC. 385. TREATMENT OF CERTAIN INTERESTS IN CORPORATIONS AS STOCK OR INDEBTEDNESS.

(a) AUTHORITY TO PRESCRIBE REGULATIONS.—The Secretary is authorized to prescribe such regulations as may be necessary or appropriate to determine whether an interest in a corporation is to be treated for purposes of this title as stock or indebtedness.

(b) FACTORS.—The regulations prescribed under this section shall set forth factors which are to be taken into account in determining with respect to a particular factual situation whether a debtor-creditor relationship exists or a corporation-shareholder relationship exists. The factors so set forth in the regulations may include among other factors:

(1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest,

(2) whether there is subordination to or preference over any indebtedness of the corporation,

(3) the ratio of debt to equity of the corporation,

(4) whether there is convertibility into the stock of the corporation, and

(5) the relationship between holdings of stock in the corporation and holdings of the interest in question.

that may (but need not) be considered in the regulations.[13] Final regulations for section 385 were issued in December of 1980, T.D. 7747, 1981-1 C.B. 141, but with a delayed effective date that subsequently was extended several times. Effective August 5, 1983, however, the section 385 regulations were withdrawn (T.D. 7920, 1983-2 C.B. 69), thus leaving only case law to guide our inquiry into the debt-equity issue.[14]

In *Georgia-Pacific Corp. v. Commissioner*, 63 T.C. 790, 796 (1975), this Court indicated that each debt-equity case must be decided on its own facts and that there are so many combinations of factual circumstances that precedents in these factual cases are generally of little value. We must look to such cases, however, to determine which factors to consider and weigh in making our factual determination in the instant case.

In *Dixie Dairies Corp. v. Commissioner*, 74 T.C. 476, 493 (1980), we cited several cases in which courts have identified and considered various factors in resolving similar questions of debt versus equity: *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972) (13 factors); *A.R. Lantz Co. v. United States*, 424 F.2d 1330, 1333 (9th Cir. 1970) (11 factors); *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968) (hereinafter cited as *Fin Hay*) (16 factors); and *Georgia-Pacific Corp. v. Commissioner, supra* at 796-799 (13 factors).

Appeals for all petitioners in the instant case would lie with the Court of Appeals for the Third Circuit, so we shall look to the approach taken by that court in *Fin Hay, supra*.[15] See *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). The court in *Fin Hay* noted that there were

---

[13]See generally B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 4.05 (4th ed. 1979 & Supp. 1987).

[14]Even if the regulations had not been withdrawn, they could only be advisory to us in the instant case since the regulations applied only to interests in corporations created after Dec. 31, 1980, 1981-1 C.B. 141, and all of the transactions in the instant case took place from 1975 through 1979.

[15]In *Inductotherm v. Commissioner, supra* at n. 11, we considered and weighed in a memorandum decision the factors enumerated in *Fin Hay*, and we agreed with the taxpayer that the payments at issue constituted equity. On appeal, the Third Circuit apparently did not disagree with our use of the *Fin Hay* factors because it affirmed our decision in an unpublished opinion. 770 F.2d at 1071.

several criteria by which to judge the true nature of an investment in a corporation:

(1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation. [398 F.2d at 696; fn. ref. omitted.]

The court cautioned, however, that:

neither any single criterion nor any series of criteria can provide a conclusive answer in the kaleidoscopic circumstances which individual cases present. See *John Kelley Co. v. Commissioner of Internal Revenue,* 326 U.S. 521, 530, 66 S.Ct. 299, 90 L.Ed. 278 (1946).

The various factors which have been identified in the cases are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship. Since there is often an element of risk in a loan, just as there is an element of risk in an equity interest, the conflicting elements do not end at a clear line in all cases.

[398 F.2d at 697; fn. ref. omitted.]

Thus, the ultimate issue under *Fin Hay* is measurement of the transactions by objective tests of economic reality, and the touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms. *Scriptomatic, Inc. v. United States,* 555 F.2d 364, 367 (3d Cir. 1977). If the shareholders' payments were far more speculative than what an outsider would make, the payments would be loans in name only. *Fin Hay,* 398 F.2d at 697.

We find that the payments to Presidential were placed at the risk of the business as an economic reality and that they were not made on the same terms as would be required by an outside lender. The economic realities require that the

payments be characterized as capital contributions for Federal tax purposes.

Before moving to our analysis of the objective tests under *Fin Hay*, however, we note that respondent's argument apparently is based on the assumption that, in form, the payments to Presidential were loans. Respondent suggests that the form of the transaction and the shareholders' intent[16] that the payments be loans are shown by the way the various records and documents characterize the advances; in fact, this seems to be the extent of respondent's argument on the debt-equity issue. As noted above, respondent's position that the payments are loans appears to be based only on the fact that the payments were denominated as loans in the various corporate documents and filings.

We, however, do not find that the payments in form were loans. We base such a finding on the inconsistent treatment of the payments in the balance sheets, and, more importantly, on the lack of any written agreement between Presidential and the shareholders to evidence the form of the payments.

Petitioner Joseph Segel was the main force behind Presidential and made the decisions for all his family members in regard to their investments in Presidential. Joseph Segel and Stanley Merves testified regarding the intent of Presidential and the shareholders, specifically Joseph Segel's intent. In brief, their testimony was that Joseph Segel was not particularly concerned with the financial or legal classification of the payments. Rather, Joseph Segel valued his reputation in the business community, and did not want to be associated with a company that had a negative net worth or that might cause a creditor to lose money from dealing with it. Although the witnesses were very credible, we do not rely on that testimony in making our findings in this case; instead, we rely on an analysis under the

---

[16]While intent of the parties is the first factor mentioned in *Fin Hay*, the court gave it short shrift in favor of the objective tests. In the instance of a closely held corporation, "Labels, which are perhaps the best expression of the subjective intention of parties to a transaction, thus lose their meaningfulness." 398 F.2d at 697. Similarly, we comment on intent only because respondent devotes so much of his case to the intent of the shareholders. As noted above, however, our decision relies on our findings using the objective tests, not on any intent of the shareholders.

objective tests enunuciated in *Fin Hay* and *Scriptomatic, Inc.*[17]

Our first objective factor, and the second factor in *Fin Hay,* is the identity between shareholders and the putative creditors. In the instant case, the payments were exactly proportional, i.e., they were made by the shareholders in exact proportion to their percentage of stock ownership of the company. Such a situation gives rise to a strong inference that the payments represent additional capital investment and not loans. *Arlington Park Jockey Club v. Sauber,* 262 F.2d 902, 906 (7th Cir. 1959). See also *Nelson v. Commissioner,* 19 T.C. 575, 580 (1952) (listing several cases that stressed the equal proportionality between payments and stockholdings and that found the payments constituted contributions to capital, not loans).

The sixth factor in *Fin Hay* concerns the risk involved in making the payments to the corporation. The more the payments are at the risk of and subject to the vagaries of the business, the more they are indicative of equity.

The payments were made for the purpose of financing the development of an airline, which, it was hoped, might be such that the airline could be operated successfully in a competitive market. During the time of the payments, Presidential incurred heavy losses; in fact, the payments apparently were used to carry on the day-to-day operations of the business. At the times of the payments, it could not be projected that the payments could be repaid out of expendable assets or soundly anticipated cash-flow. There could have been no reasonably anticipated source out of which any repayments could have been made within a reasonably foreseeable time. Rather, such repayment could only be assured if the theretofore unsuccessful business of Presidential turned around and began generating profits.

[17]Respondent has not suggested in his briefs that we should require any higher standard of proof before allowing petitioners to testify or to argue against their own "form" of the transaction. See *Commissioner v. Danielson,* 378 F.2d 771, 775 (3d Cir. 1967), revg. and remanding 44 T.C. 549 (1965) (rejecting the "strong proof" standard that this Court requires before a taxpayer will be allowed to avoid the form of his own transaction, and imposing a more restrictive standard regarding the admissibility of evidence to challenge a party's own agreement); cf. *Coleman v. Commissioner,* 87 T.C. 178, 202 (1986), on appeal (3d Cir., Mar. 10, 1987). Respondent's lack of argument regarding the standard of proof is immaterial because even Joseph Segel's testimony would be admissible under the *Danielson* standard. There was no written agreement under which the payments were made to Presidential by the shareholders, so testimony would be necessary to establish the understanding, if any, under which the payments were made.

Putative "loans" such as these, made to a business which had not demonstrated a capacity for making a profit, and for such basic needs as day-to-day working capital, are, by their very nature, placed at risk of the business. See *Gustin v. Commissioner*, 412 F.2d 803, 804 (6th Cir. 1969), affg. a Memorandum Opinion of this Court.[18]

The distributions made in 1977 and 1978 only bolster this analysis. They were not made out of cash-flow or expendable assets; rather, they were made out of proceeds from sales of Presidential's major operating assets—the aircraft. In fact, Joseph Segel testified that the distributions of proceeds to shareholders were distributions from sales of aircraft as the business was "winding down."

Presidential's balance sheets and Federal tax returns bear out Mr. Segel's statement. The end of year balance sheets for Presidential list as assets aircraft having original costs as follow:

| As of Dec. 31— | Cost |
|---|---|
| 1975 | $5,066,298 |
| 1976 | 5,332,521 |
| 1977 | 2,089,251 |

The 1975 tax return claimed investment credits (for "pass through" to the shareholders) for "seven year property" with a basis of $5,066,298—the same value as given for the cost of aircraft on the 1975 balance sheet. The 1977 and 1978 tax returns show recapture of investment credits for aircraft placed into service in December of 1975 in the aggregate amounts of $3,168,562 and $1,063,711,[19] respectively. Thus, of the aircraft owned by Presidential at the end of 1976, approximately 80 percent (when measured by

---

[18] See also *Inductotherm v. Commissioner, supra* at n. 11.

[19] In the notes accompanying the balance sheet as of Dec. 31, 1977, is the following:

Note 3          Subsequent events

On Feb. 10, 1978, Presidential Airways sold its last helicopter to Western Reserve Leasing Corp. for $170,000.

On June 16, 1978, Presidential Airways sold one of its two remaining airplanes to Don Love Aircraft Sales, Inc. for $727,500.

Presidential's 1978 tax return shows investment credit recapture for two items purchased in 1975: a "*Gazelle*" having a cost of $232,105 that was sold in February 1978, and a "*Citation*" having a cost of $831,606, and sold in June 1978. The *Gazelle* and the *Citation* appear to be the helicopter and the airplane discussed in note 3 to the balance sheet.

the original cost of the aircraft) were sold or otherwise disposed of by June 1978.[20]

The aircraft were essential for Presidential to keep its charter aircraft company in business. The disposition of the aircraft only shrank the capacity of Presidential to provide services to customers. By no means could it be said that the distributions to the shareholders were attributable to the sale of Presidential's expendable assets. Rather, the distributions to the shareholders could be made by Presidential only because it was liquidating the bulk of its core assets, not because Presidential was generating income and profits from its operations. In short, as noted above, it is clear that, at the time the payments were made, any return of the payments was extremely speculative and the payments thus constituted risk capital. See *Diamond Brothers Co. v. Commissioner,* 322 F.2d 725, 732 (3d Cir. 1963), affg. a Memorandum Opinion of this Court.

Most important to our ruling in this case, and key to an analysis under *Fin Hay,* however, is the independent creditor test. This is similar to the fourth factor in *Fin Hay*—the ability of the corporation to obtain funds from outside sources. The focus of the court in *Fin Hay,* however, is not simply on the ability of a corporation to obtain the funds from outside sources; rather, the focus is whether an outside lender would have lent the funds on the *same or similar terms. Scriptomatic, Inc. v. United States* 555 F.2d at 368; *Fin Hay,* 398 F.2d at 697. We do not doubt that an outside lender could have been found to finance Presidential's incorporation and operations; Joseph Segel's experience and track record were impressive and likely would have been sufficient to convince a lender to finance Presidential. What we cannot believe, however, is that a disinterested outside lender would have lent the money to Presidential in a debtor-creditor relationship on the same, or anywhere near the same, terms as did the shareholders.

[20]Presidential's tax returns also show investment credits of $3,492,684 taken in 1977 for two Gates Lear Jets which were subleased by Presidential, but for which the lessor and sub-lessor made elections to pass through the investment credits to the sublessee, Presidential. These investment credits in turn were passed through from Presidential to the shareholders. Presidential's 1978 tax return shows no investment credit available, but does show recapture of investment credit of $1,733,300 for "aircraft" placed in service in August 1977. Apparently, one of the two Lear Jets leased in 1977 ceased to be used by Presidential in 1978, so that Presidential had at its disposal no helicopters and only one or two planes by the end of 1978. See also note 19 *supra.*

Will Rogers is attributed with saying that it was not the return *on* his investment that he was concerned with * * * it was the return *of* his investment that mattered. In the real world, however, "a true lender is concerned with interest." *Curry v. United States,* 396 F.2d 630, 634 (5th Cir. 1968), cert. denied 393 U.S. 967 (1968). No interest was ever paid to the shareholders by Presidential, nor was there any contemplated during the period when the payments were outstanding. The 10th factor set forth in *Fin Hay* refers to the provision of a fixed rate of interest. Here there was no interest provision whatsoever, much less one that was fixed or determinable. If a lender does not insist upon interest payments, he is, therefore, interested in the future earnings of the corporation or their increased market value. *Stinnett's Pontiac Service v. Commissioner,* 730 F.2d 634, 640 (11th Cir. 1984), affg. a Memorandum Opinion of this Court; *Curry v. United States, supra.* Such a disinterest in interest points to a "contribution to capital conclusion." *Curry v. United States, supra* at 634.

We also note that (1) there were no written agreements between the shareholders and Presidential to evidence any indebtedness; (2) the shareholders received no security interest to secure repayment of the payments (beyond what they already possessed as stockholders); and (3) there was no fixed time or schedule for repayment of the payments (7th, 8th, and 13th factors in *Fin Hay*). Those factors also are indicative of an equity contribution, rather than a debtor-creditor relationship.

More importantly to our inquiry under *Fin Hay,* however, these particulars do not comport with what we believe an outside lender would require. In *Scriptomatic, Inc. v. United States,* 555 F.2d at 368, the Third Circuit noted that the crucial issue is what the market would accept as debt. We believe that an outside lender, at the outset, would require some formal indicia of the understanding by which the funds are advanced; even if the payments were on open account, a prudent businessperson would require a written agreement to that effect to protect such an investment. Additionally, we believe that an outside lender would *require* interest for use of the funds and some time or

schedule for repayment, if not some security for the debt as well.

A rose is a rose is a rose is a rose.[21] Similarly, equity is equity is equity, regardless of what appellation an investor might use in describing it. A use of words does not change the nature of things. *Marye v. Parsons,* 114 U.S. 325, 337 (1885) (Bradley, J., dissenting). We find that, regardless of how they were reported on the various balance sheets, the payments were made on a basis far more speculative than that which an outside lender would require.[22]

Pursuant to *Fin Hay,* we hold that the payments constituted equity capital and not bona fide loans, and, thus, the distributions are nontaxable returns of capital to petitioners. In that we find for petitioners on this issue, we need not consider their other contentions regarding the nonincludability in income of the repayments from Presidential.

## II. *Investment Credits—Minimum Tax*

### ADDITIONAL FINDINGS OF FACT

Presidential placed into service section 38 property for which investment tax credits (hereinafter ITC or ITC's) were available and taken during the period that the Segel family owned the company. Certain of the assets for which ITC's were taken ceased to be section 38 property in 1977 and 1978.

Petitioners filed timely Applications for Tentative Refund (Forms 1045) with respondent as a result of carrybacks of either unused ITC's or net operating loss deductions for the years shown below: [23]

|  | *Year(s) claim arose* | *Year(s) to which carried back* |
| --- | --- | --- |
| Joseph/Mary Segel | 1975, 1977, 1978 | 1972, 1974, 1975 |
| Alan Segel | 1975, 1976, 1977 | 1972, 1973, 1974 |

---

[21]G. Stein, Geography and Plays: Sacred Emily (1922).

[22]Even if, as respondent asserts, petitioners have treated the payments in form as loans during the years in which they controlled Presidential's books of account and tax filings, petitioners have more than met any "strong proof" burden that might be required of them for disallowing the form of the transaction. Our findings in regard to the objective factors mandated under *Fin Hay* satisfy the strong proof standard discussed in *Coleman v. Commissioner,* 87 T.C. at 201-203.

[23]Any years for which petitioners Michael and Sandy Stern may have filed applications for tentative refund are not at issue before the Court.

| | Year(s) claim arose | Year(s) to which carried back |
|---|---|---|
| Marvin Segel | 1975, 1977 | 1972, 1974 |
| Marvin/Rhonda Segel | 1978 | 1975 |
| Fannie Segel | 1975, 1977 | 1972, 1974, 1975 |

Respondent originally allowed the tentative refunds as they were filed. The ITC's and net operating losses reported by petitioners were due largely to ITC's and corporate losses generated by Presidential and passed through to petitioners.

After petitioners' last refund filing with respect to each of the years at issue, their tax returns reported the following items and amounts:

| Petitioner | Year | Minimum tax | ITC | ITC recapture |
|---|---|---|---|---|
| Joseph and | 1972 | $105,481 | $229,835 | - - - |
| Doris Segel | 1974 | 88,597 | 68,515 | - - - |
| | 1975 | 123,551 | 49,128 | - - - |
| | 1977 | - - - | 1,180 | $190,114 |
| | 1978 | - - - | - - - | - - - |
| Alan Segel | 1972 | 51 | 15,148 | - - - |
| | 1973 | 781 | 22,015 | - - - |
| | 1975 | 12,720 | 26,966 | - - - |
| | 1978 | - - - | - - - | - - - |
| Marvin Segel | 1972 | 23,305 | 21,268 | - - - |
| | 1974 | 13,774 | 20,172 | - - - |
| | 1975 | 44,859 | 73,837 | - - - |
| Marvin and | 1977 | - - - | - - - | 63,371 |
| Rhonda Segel | 1978 | - - - | - - - | - - - |
| Fannie Segel | 1975 | 5,131 | 21,087 | - - - |
| | 1977 | - - - | - - - | 12,674 |
| | 1978 | - - - | 6,186 | 11,438 |
| Michael and Sandy Stern | 1978 | - - - | - - - | - - - |

Except for Fannie Segel, none of the petitioners reported any ITC recapture for 1978.

In the notices of deficiency, respondent determined that petitioners' minimum tax, ITC, and ITC recapture should be as follows:

| Petitioner | Year | Minimum tax | ITC | ITC recapture |
|---|---|---|---|---|
| Joseph and | 1972 | $102,219.00 | $197,210 | - - - |
| Mary Segel | 1974 | 72,978.00 | 211,275 | - - - |
| | 1975 | 117,320.00 | 111,441 | - - - |
| | 1977 | - - - | - - - | $194,766 |
| | 1978 | - - - | - - - | 171,562 |
| Alan Segel | 1972 | - - - | 7,599 | - - - |

| Petitioner | Year | Minimum tax | ITC | ITC recapture |
|---|---|---|---|---|
| | 1973 | - - - | $3,991 | - - - |
| | 1975 | $12,258.00 | 33,250 | - - - |
| | 1978 | - - - | - - - | $22,082 |
| Marvin Segel | 1972 | 22,952.59 | 17,743 | - - - |
| | 1974 | 10,379.00 | 58,789 | - - - |
| | 1975 | 43,801.00 | 84,371 | - - - |
| Marvin and | 1977 | - - - | - - - | 64,921 |
| Rhonda Segel | 1978 | - - - | 89 | 57,234 |
| Fannie Segel | 1975 | 5,131.00 | 21,087 | - - - |
| | 1977 | - - - | 4,253 | 12,984 |
| | 1978 | - - - | 825 | 11,438 |
| Michael and Sandy Stern | 1978 | - - - | 39 | [24]22,922 |

The only items of tax preference reported by petitioners Alan, Marvin, and Fannie Segel were long-term capital gains. Petitioners Joseph and Doris Segel reported items of tax preference as follows:

| | 1972 | 1974 | 1975 |
|---|---|---|---|
| Capital gains | $1,684,373.94 | $954,698 | $1,288,966 |
| Accelerated depreciation on real property | 2,335.54 | 812 | 580 |
| Depletion | 990.00 | 3,977 | - - - |

Respondent does not contest the items of tax preference as reported by petitioners.

## OPINION

We are asked to decide whether petitioners are entitled to any relief from the requirement of section 47 that petitioners must recapture the full amount of excess ITC upon the

---

[24]In respondent's brief, the proposed findings of fact numbered 163 and 179 appear inconsistent. No. 163 suggests that, with regard to the sec. 38 property disposed of by Presidential in 1978, the Sterns utilized only $18,875 of the total available credit. No. 179 asserts that the Sterns failed to report and are liable for $22,922 of ITC recapture resulting from Presidential's disposition of sec. 38 property in 1978. If No. 163 were correct, then No. 179 would overstate the Sterns' liability for recapture. See Rev. Rul. 72-221, 1972-2 C.B. 15. However, No. 163 appears to be an error. In the notice of deficiency issued to the Sterns, respondent determined on a Form 4255 (Recapture of Investment Credit) that the Sterns were liable for ITC recapture for assets disposed of in *1977* (a year not in dispute herein) in the amount of $18,875. According to the Form 4255 for 1978 that is attached to the notice of deficiency, the Sterns are liable for $22,922 in ITC recapture for 1978. Petitioners never address the apparent discrepancy, so we shall assume that respondent's requested fact No.163 is simply an error in amount, and that this determination and requested finding of fact is that the Sterns utilized at least $22,922 of the total available ITC's set forth in appendix 7 to respondent's brief.

early disposition of section 38 property where the ITC caused an increase in minimum tax in the year the ITC was taken. No testimony was given regarding this issue.

Respondent asserts that petitioners must report in 1977 and 1978, as a result of the disposition of section 38 property by Presidential, additional tax from the recapture of ITC's originally generated by Presidential in 1975, 1976, and 1977. Respondent contends that petitioners must recapture under section 47(a)[25] the full amount of the credits because petitioners were entitled to their full share of the credits in the years that Presidential placed the section 38 property into service.[26]

Petitioners advance two arguments in the alternative regarding this issue. First, petitioners posit that they must recapture previously claimed ITC's only to the extent that they received a tax benefit from the ITC's that actually reduced their tax liabilities. Even though the ITC's seem to have fully reduced petitioners' tax liabilities, petitioners assert that they did not receive the full benefit of the ITC's because they also were liable for minimum tax in years to which the credits were carried back. For example,[27] according to petitioners' brief, consider a taxpayer who had

---

[25]The pertinent parts of sec. 47 read as follows for the 1977 and 1978 tax years:

SEC. 47. CERTAIN DISPOSITIONS, ETC., OF SECTION 38 PROPERTY.
(a) GENERAL RULE.—Under regulations prescribed by the Secretary—
(1) EARLY DISPOSITION, ETC.—If during any taxable year any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, before the close of the useful life which was taken into account in computing the credit under section 38, then the tax under this chapter for such taxable year shall be increased by an amount equal to the aggregate decrease in the credits allowed under section 38 for all prior taxable years which would have resulted solely from substituting, in determining qualified investment, for such useful life the period beginning with the time such property was placed in service by the taxpayer and ending with the time such property ceased to be section 38 property.

        *        *        *        *        *        *        *.

(4) CARRYBACKS AND CARRYOVERS ADJUSTED.—In the case of any cessation described in paragraph (1) * * *, the carrybacks and carryovers under section 46(b) shall be adjusted by reason of such cessation * * *

[26]There is no assertion that petitioners had any ITC's that were not carried back fully to reduce their taxes. Because there does not appear to be any ITC carryover remaining in 1977 and 1978 for use by petitioners, sec. 1.47-1(b)(3) and -1(d), example (3), Income Tax Regs., is inapposite, and the recapture amounts in full should increase petitioners' taxes in 1977 and 1978 to the extent we do not find otherwise on account of petitioners' arguments.

[27]This example approximates Joseph and Doris Segel's tax return for 1972 as last amended; however, to simplify the example, we have rounded the dollar amounts and expressed those amounts in thousands of dollars.

regular tax imposed[28] of $830 and ITC's available in the amount of $230. If that taxpayer were liable for $100 of minimum tax, his total tax liability would be $700 (830 − 230 + 100). Since that is a decrease of only $130 (830 − 700) from his "regular tax imposed," the taxpayer, according to petitioner, has received the benefit of only $130 of the ITC's and should recapture only the $130 of the ITC's for which he has received a tax benefit.

Petitioners' second argument is best demonstrated by another numerical example that exemplifies the true interplay between ITC and the minimum tax during the years at issue. Under section 56,[29] as in effect during 1972 through 1975 (the years for which petitioners were liable for minimum tax according to the notices of deficiency), minimum tax was in addition to any other tax owed by a taxpayer, and the amount of minimum tax was calculated by applying a rate of 10 percent to the minimum tax base. The minimum tax base was computed as follows:[30]

---

[28]Petitioners did not use the term "regular tax imposed" in their brief; however, for the sake of consistency within our opinion, we shall use that term to describe the regular tax before any consideration of ITC's and minimum tax. See note 30 *infra*.

[29]SEC. 56. IMPOSITION OF TAX.

(a) IN GENERAL.—In addition to the other taxes imposed by this chapter, there is hereby imposed for each taxable year, with respect to the income of every person, a tax equal to 10 percent of the amount (if any) by which—

    (1) the sum of the items of tax preference in excess of $30,000 is greater than

    (2) the sum of—

        (A) the taxes imposed by this chapter for the taxable year * * * reduced by the sum of the credits allowable underd—

            (i) section 33 (relating to foreign tax credit)

            (ii) section 37 (relating to retirement income), [and]

            (iii) section 38 (relating to investment credit),

           *       *       *       *       *       *       *

        * * *; and

    (B) the tax carryovers to the taxable year.

Sec. 56 was amended so that the minimum tax applied only to corporations for tax years beginning after Dec. 31, 1982. The minimum tax subsequently was eliminated by the Tax Reform Act of 1986, effective for years beginning after Dec. 31, 1986. Under current law, sec. 56 is a provision relating to computation of the alternative minimum tax.

[30]This simplified description of the minimum tax only includes the items relevant to our discussion in the instant case. We use the term "regular tax imposed," as did the Court of Claims in *Occidental Petroleum Corp. v. United States*, 685 F.2d 1346, 1347 (Ct. Cl. 1982), to refer to those amounts assessed under secs. 1 through 1552, calculated without regard to (a) the minimum tax, (b) the other special taxes mentioned within sec. 56 (none of which applies here), and (c) the credits enumerated in sec. 56 (of which only ITC is applicable).

Items of tax preference

| | |
|---|---|
| less: | $30,000 |
| less: | Regular tax imposed |
| plus: | Various allowable credits, e.g., ITC |

Assuming a taxpayer had $100,000 of tax preference items and "regular tax imposed" of $25,000, the difference in his "net tax liability," with and without ITC's of $20,000, is shown by the following computation:

| | With ITC's | No ITC's |
|---|---|---|
| Tax preferences | $100,000 | $100,000 |
| Less: | (30,000) | (30,000) |
| Less: Regular tax imposed | (25,000) | (25,000) |
| Plus: ITC's | 20,000 | - - - |
| Minimum tax base | $65,000 | $45,000 |
| Minimum tax rate | ×10% | ×10% |
| Minimum tax | $6,500 | $4,500 |
| Plus: Regular tax imposed | 25,000 | 25,000 |
| Less: ITC's | (20,000) | - - - |
| Net tax liability | 11,500 | 29,500 |

Thus, even though ITC's of $20,000 were available, the taxpayer would have a reduction of only $18,000 (29,500 − 11,500) in his net tax liability. The difference is equal to 10 percent of the ITC's taken, and occurs because the "minimum tax base" is increased when ITC's are taken by the taxpayers. In short, for a taxpayer who is otherwise subject to the minimum tax, $100 of ITC will generate a decrease in net tax liability of only $90 because of the concomitant increase in the minimum tax. Thus, petitioners argue that they either (1) are entitled to a refund of or decrease in their minimum tax for the years at issue; or (2) are required to recapture ITC's only in the amount of their "tax benefit," i.e., 90 percent of the ITC's available to and taken by them.

With regard to petitioners' first argument, their brief states, "As is clear * * * , the benefit of all the credits claimed by petitioners was not realized due to the imposition of a minimum tax. * * * the petitioners' minimum tax liability reduced or eliminated the benefit of some or all of the credits originally claimed." It is not at all clear why petitioners believe they did not receive any benefit from the ITC's that they claimed.[31] While the operation of section 56

---

[31]Petitioners' first argument appears to be based on an example from the legislative history accompanying the enactment of the alternative minimum tax and illustrating newly enacted

indirectly reduced that benefit; the ITC's petitioners claimed fully reduced their tax liability. If the taxpayer in the first example had not taken ITC, his tax liability would be the regular tax imposed of $830 plus minimum tax of $77 ($100 – (ITC of $230 multiplied by 10%)), for a total of $907. In the example, the taxpayer only owed $700 of taxes. That taxpayer most certainly received a benefit from the ITC's in the amount of $207 (907 – 700) by use of the ITC's. It is only to the extent of the 10-percent increase in his minimum tax that the taxpayer has a plausible argument that he has received "no" benefit. That 10-percent increase, however, is the gravamen of petitioners' second argument. In short, we find petitioners' first argument wholly without merit because they received the benefit of the ITC's to the extent their total taxes were reduced by 90 percent of the ITC's taken by them.

In regard to petitioners' second argument, there is no language in the Code or legislative history that specifically allows such a reduction in either ITC recapture or the minimum tax for the years at issue. Based upon our interpretation below of sections 47 and 56, we apply those sections as written, and we sustain respondent's determinations with regard to ITC recapture.

Respondent's brief, in appendices 1 through 7, specifies values of section 38 property disposed of by Presidential in 1977 and 1978, and the amounts of ITC taken thereon by

Code sec. 55(c)(3). See S. Rept. 95-1263 (1978), 1978-3 C.B. (Vol. 1) 315, 502-503; H. Rept. 95-1800 (Conf.) (1978), 1978-3 C.B. (Vol. 1) 521, 601 (hereinafter referred to as Conf. Rept.). Sec. 55(c)(3), however, applies only to the alternative minimum tax of sec. 55, not to the add-on minimum tax of sec. 56, and was effective only for tax years beginning *after* Dec. 31, 1978. Thus, sec. 55(c)(3) is inapplicable to the instant case because it did not go into effect until subsequent to all the years at issue in the instant case.

Also, in *Huntsberry v. Commissioner,* 83 T.C. 742, 749 (1984), we noted, "It is important that the differences between [the alternative minimum tax and the add-on minimum tax] be kept clearly in mind. * * * they are differently structured and have independent spheres of operation." See also *First Chicago Corp. v. Commissioner,* 88 T.C. 663, 668 n. 5 (1987). The minimum tax was simply a tax on tax preferences. *Huntsberry v. Commissioner, supra.* Minimum tax was imposed without regard to any other taxes or credits (except for the indirect effect via the minimum tax base.) The alternative minimum tax, on the other hand, is a tax imposed whenever the sum of the statutory percentages of "alternative minimum taxable income" exceeds the "regular tax" (the tax after addition of the add-on minimum tax and reduction for available tax credits) for the year. *Huntsberry v. Commissioner, supra* at 744; Conf. Rept., *supra,* 1978-3 C.B. (Vol. 1) at 601. The alternative minimum tax is "in effect a true alternative tax, in the sense that it is paid only when the amount of tax computed under [sec. 55] exceeds regular tax" (Conf. Rept., *supra,* 1978-3 C.B. (Vol. 1) at 598); it does not grant any reduction in or benefit against tax liability for any ITC's that otherwise might be available to a taxpayer that year.

petitioners. Appendices 1 through 7 appear to comport with the tax returns in evidence and with the notices of deficiency issued by respondent.[32] According to these documents, petitioners have paid ITC recapture on most of the 1977 dispositions, but, with the exception of Fannie Segel, on none of the 1978 dispositions. Respondent asserts that petitioners are liable for recapture of all ITC taken on the section 38 property disposed of in 1977 and 1978, except for furniture and fixtures placed in service in 1975 and disposed of in 1978.[33]

Petitioners' second argument contains three alternatives, all of which are permutations of the tax benefit rule. The tax benefit rule is a judicially developed principle that "allays some of the inflexibilities of the annual accounting system." *Hillsboro National Bank v. Commissioner*, 460 U.S. 370, 378 (1983) (hereinafter *Hillsboro*).[34] Even though the rule originated in the Courts, it has the implicit approval of Congress, which has enacted section 111 as a general limitation of the rule. *Hillsboro, supra* at 378 n. 8. Sections 58(h) and 47(a) provide other codifications of the tax benefit rule for specific circumstances.

In regard to our construction and interpretation of these provisions, there is no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes; where these words are sufficient in and of themselves to determine the purpose of a statute, we should follow their plain meaning. *United States v. American Trucking Association*, 310 U.S. 534, 543 (1940); *Estate of Leder v. Commissioner*, 89 T.C. 235 (1987). This Court requires unequivocal evidence of legislative purposes before we construe a statute so as to override the plain meaning of the words used therein.

---

[32]While petitioners' briefs analyze the legal theories regarding the interplay between ITC's and the minimum tax, they do not make any specific computations with respect to the amounts of minimum tax or ITC recapture that should or should not be charged to them. Thus, we conclude that petitioners have conceded as correct the amounts of ITC and the dates of acquisition and disposition of the sec. 38 property as presented by respondent.

[33]The furniture and fixtures had estimated useful lives of 5 years and were in service long enough so that respondent asserts that only half of the ITC taken on them must be recaptured.

[34]*Hillsboro* dealt with the tax benefit rule and when it applies to require the inclusion of income. The instant case, however, concerns the applicability of the tax benefit rule to the minimum tax or to ITC's, neither of which was considered in *Hillsboro*.

*Estate of Leder v. Commissioner, supra; Huntsberry v. Commissioner,* 83 T.C. 742, 747-748 (1984).

The law is well settled that tax deductions and credits are a matter of legislative grace and the burden of showing clearly the right to the claimed credits is on the taxpayer. *Interstate Transit Lines v. Commissioner,* 319 U.S. 590, 593 (1943); *Hokanson v. Commissioner,* 730 F.2d 1245, 1250 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; *Rickard v. Commissioner,* 88 T.C. 188, 196 (1987); Rule 142(a). Petitioners also bear the burden of proving that respondent's determinations regarding the amounts of recapture are not correct. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a).

We first consider section 111 which, as in effect during the years at issue (1972 through 1978), read as follows:

SEC. 111. RECOVERY OF BAD DEBTS, PRIOR TAXES, AND DELINQUENCY AMOUNTS

(a) GENERAL RULE.—Gross income does not include income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount.

(b) DEFINITIONS.—For purposes of subsection (a)—

\*       \*       \*       \*       \*       \*       \*

(2) PRIOR TAX.—The term "prior tax" means a tax on account of which a deduction or credit was allowed for a prior taxable year.

\*       \*       \*       \*       \*       \*       \*

(4) RECOVERY EXCLUSION.—The term "recovery exclusion", with respect to a bad debt, prior tax, or delinquency amount, means the amount, determined in accordance with regulations prescribed by the Secretary, of the deductions or credits allowed, on account of such bad debt, prior tax, or delinquency amount, which did not result in a reduction of the taxpayer's tax under this subtitle \* \* \* or corresponding provisions of prior income tax laws \* \* \* , reduced by the amount excludable in previous taxable years with respect to such debt, tax, or amount under this section.[35]

Although it could appear that section 111(b)(4) might apply to a situation where a tax credit did not actually reduce a taxpayer's total tax, such as in the instant case, we have found no cases that discuss the issue. Thus, we must consider the plain meaning of all the subsections of

[35]Pub. L. 94-455, sec. 1906(b)(13)(A), 90 Stat. 1384, substituted "Secretary" for "Secretary or his delegate" in par. (b)(4), for years beginning after 1976.

section 111. We start with the introduction to section 111(b). Section 111(b) introduces paragraph (b)(4) with, "For purposes of subsection (a)—." Thus, section 111(b)(4) only should be read for its impact upon the general rule enunciated in section 111(a). That general rule does not refer at all to tax credits; the plain meaning of section 111(a) is that it only excludes specified amounts from gross income.[36] There is no assertion in the instant case that any part of the ITC's to be recaptured should be included in petitioners' income. Thus, we find that section 111, as in effect in the pertinent years, is inapplicable and does not preclude full recapture of the ITC's. The parties apparently agree with this conclusion since they do not even mention section 111 in their briefs.

Next, we consider section 58(h), which was added by section 301(d) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1553. It provides:

SEC. 58. RULES FOR APPLICATION OF THIS PART

(h) REGULATIONS TO INCLUDE TAX BENEFIT RULE.—The Secretary shall prescribe regulations under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax under this subtitle for any taxable years.

Petitioners suggest that section 58(h) exhibits a clear congressional effort "to apply the tax benefit rule in a broad and comprehensive manner where the application of

---

[36]The legislative history supporting the enactment of sec. 22(b)(12), the predecessor provision to sec. 111, reads similarly. See H. Rept. 2333, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 372, 426-427; S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 565-566. In 1954, sec. 22(b)(12) was reenacted as sec. 111 of the Internal Revenue Code of 1954 without significant change in wording and without any legislative comment.

We also note that in 1984, Congress amended sec. 111. Sec. 111(b)(2) now applies to credits so that, as a general rule, a credit which did not actually reduce tax need not be recaptured. However, sec. 111(b)(3) specifically provides that the general rule for credits shall not apply to ITC's and foreign tax credits. The Conference report to that amendment and the General Explanation by the Joint Committee explained the exception for ITC's and foreign tax credits by noting that specific rules already were applicable to these credits under existing law. H. Rept. 98-861 (Conf.) (1984), 1984-3 C.B. (Vol. 3) 1, 265; Staff of the Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 at 522 (Comm. Print 1984). Congress apparently did not perceive sec. 111, as in effect before 1984, as applying any tax benefit rule to the recapture of tax credits.

Even if Congress may have thought that the former sec. 111 applied to recapture of credits, and tried to make such an application more explicit with the 1984 amendment, petitioners have not offered, and we have not found, any such indication. Since we require unequivocal evidence to override a statute's plain meaning under *Huntsberry v. Commissioner, supra*, and we have not found any such evidence, we follow the plain meaning of sec. 111.

the minimum tax deprives taxpayers of benefits to which they are otherwise entitled.'' Section 301(g) of the 1976 Act provided, however, that section 58(h) was effective only after December 31, 1975. The years for which petitioners were liable for the minimum tax (1972 through 1975) all predate the effective date of section 58(h). See *Occidental Petroleum Corp. v. United States*, 231 Ct. Cl. 334, 685 F.2d 1346, 1351-1352 (1982) (holding that section 58(h) was inapplicable to years beginning prior to December 31, 1975) (hereinafter *Occidental I*). Accord *First Chicago Corp. v. Commissioner*, 88 T.C. 663, 667 (1987).

Nevertheless, petitioners urge the Court to "provide an equitable application [of the tax benefit rule] for taxable years prior to the time the statutory relief became available." Petitioners cite *First Chicago Corp.* as authority for granting them relief in a case such as this where the imposition of the minimum tax "might result in an unfair result." If *First Chicago Corp.* were apposite to petitioners herein, the case of *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. 819 (1984) (hereinafter *Occidental II*), would apply also.

Both *Occidental* cases involved the same taxpayer and the same general issue, to wit, whether the taxpayer was liable for minimum tax where available foreign tax credits were more than sufficient to eliminate all Federal income tax for the taxable years in question, regardless of whether the tax preference items were taken into account in computing the tax. 82 T.C. at 822-823. In *Occidental I* the Court of Claims held that, in regard to tax years 1970 and 1971, the taxpayer *was* liable for the minimum tax because it had benefited from the preference items by receiving increased foreign tax credit carryovers and because section 58(h) was effective only subsequent to the years at issue. 685 F.2d at 1351, 1353. In *Occidental II* we held that, in regard to tax years 1976 and 1977, the taxpayer *was not* liable for the minimum tax because of two differences between our case and *Occidental I,* to wit: (1) section 58(h) was effective during 1976 and 1977, and (2) the parties in *Occidental II* had stipulated that the excess foreign tax credits freed by the tax preferences had expired unused. 88 T.C. at 823.

*First Chicago Corp.* involved an issue similar to the issue decided in *Occidental II*—the taxpayer's liability for minimum tax in 1980 and 1981 where foreign tax credits and ITC's were sufficient to satisfy the full tax liability of the taxpayer even if the tax preference items were not used to decrease taxable income. In *First Chicago Corp.* we held that under section 58(h) the taxpayer was not liable for minimum tax in the years at issue. We applied section 58(h) to hold that minimum tax could be imposed only in the year or years that the tax preferences actually generate tax benefits through the operation of the freed-up credit carryovers. 88 T.C. at 672.

The doctrine of section 58(h), as enunciated in *Occidental II* and *First Chicago Corp.*, does not provide relief for petitioners in the instant case, regardless of the effective date of the provisions of section 58(h). The taxpayers in *First Chicago Corp.* and the *Occidental* cases never received any tax benefit from the tax preference items; the deductions available through the preferences never affected the actual amount of Federal income tax for which the taxpayers were liable. Use of the preference items lowered the taxpayers' taxable incomes, but the only tax implication of the lowered incomes was that larger amounts of tax credit carryovers were available for use in future years. In short, had the taxpayers in those cases not taken deductions attributable to the tax preference items, they nevertheless would have paid no more tax for the years at issue. Those taxpayers would have obtained a tax benefit from the preference items only in years in which they actually decreased their net tax liability by utilizing credit carryovers greater in amount than the credit carryovers available from a computation of taxable income excluding the tax preference items. Under the holding of *First Chicago Corp.*, minimum tax liability would accrue only in those years that the taxpayers received a tax benefit from using the additional carried over credits.[37]

The situation of petitioners was totally disparate from the taxpayers in *Occidental II* and *First Chicago Corp.* Petition-

---

[37]In *Occidental II* we were not called upon to contemplate liability for minimum tax in other years because the parties in that case had stipulated that the tax credit carrybacks and carryovers already had expired unused. 82 T.C. at 828-829.

ers received the full benefit of the tax preference items in the years 1972 through 1975. The great majority of their preference items arose from the deduction from gross income of 50 percent of their net long-term capital gains. See sec. 57(a)(9). After allowing for carrybacks during the years 1972 through 1975, petitioners, in the instant case, had taxable incomes and did not have sufficient tax credits available to offset their total income tax liabilities. Had they not received the benefit of the deductions from income of part of their capital gains, they would have had higher taxable incomes and greater amounts of tax to pay. See sec. 1202. The capital gains deductions generated tax benefits by decreasing their taxable incomes and, thus, their net tax liabilities. In short, the tax benefit rule of section 58(h), even if applicable for the years 1972 through 1975, would not, under *Occidental II* or *First Chicago Corp.,* offer any relief to petitioners from their minimum tax liability. Petitioners received the full tax benefit from their tax preference items because the actual taxes they owed and paid were decreased on account of the deductions from gross income of 50 percent of their net long-term capital gains.

We also believe the policy behind the minimum tax warrants no reduction in the minimum tax on account of tax credits taken. Section 56(a)(2)(A) allowed an exemption from the computation of the minimum tax base for the regular tax imposed, net of allowable credits. That provision originated in a Senate amendment proposed by Senator Miller and ultimately was included in the final version of section 56 when Congress first enacted the minimum tax in 1969. In the floor debate, Senator Miller described the purpose of the amendment that ultimately became section 56(a)(2)(A): "it provides that those people who are paying taxes can subtract from their tax preferences the amount of their tax. That gives those who are paying some tax a break. It gives those who are paying little or no tax very little break at all." 115 Cong. Rec. 38298 (1969). Thus, the exemption for taxes paid net of credits allowable was intended to lessen the effect of the minimum tax on those taxpayers actually having tax liability. For those taxpayers with a lower tax liability, whether caused by allowable tax

credits or by deductions against taxable income, Congress did not intend to grant such a "break;" those taxpayers were to pay the 10-percent tax on more of their preference items.

Petitioners, however, are asking for just the sort of break that is the antipode of the intent of Senator Miller's amendment. In accordance with Senator Miller's description of section 56(a)(2)(A), to the extent that their regular tax liabilities were lowered due to the credits, petitioners should not receive a decrease of their minimum tax. Petitioners simply paid minimum tax on a greater portion of their tax preference items by virtue of the ITC's. Such a result was the intent of Congress when it enacted section 56(a)(2)(A), and we find that no decrease in petitioners' minimum tax for the years at issue is warranted.

We last consider whether petitioners must recapture the full amounts of the ITC under the provisions of section 47(a). Petitioners suggest that under Rev. Rul. 72-221, 1972-1 C.B. 15, they are required to recapture only the amount of the ITC's that reduced their total tax liability. It is well settled, however, that a revenue ruling merely represents the Commissioner's position with respect to a specific factual situation; it does not constitute precedential authority. *Stubbs, Overbeck & Associates v. United States,* 445 F.2d 1142, 1146-1147 (5th Cir. 1971); *Stark v. Commissioner,* 86 T.C. 243, 250-251 (1986). Furthermore, Rev. Rul. 72-221 does not contain facts similar to the instant case. That ruling only contemplates the recapture required where a taxpayer disposed of section 38 property on which ITC had been taken, when unused ITC carryovers from other years were also available. Rev. Rul. 72-221 does not contemplate at all the interplay of the minimum tax and ITC's. After the trial and the submission of briefs and reply briefs in the instant case, respondent issued Rev. Rul. 87-56, 1987-27 Internal Revenue Bulletin 7 (July 6, 1987). That ruling held, on substantially similar facts as in the instant case, that the taxpayer was required to recapture the full amount of the ITC's without any decrease in the minimum tax. That ruling reaches the same conclusion that we reach herein; however, as noted above, it is not precedential authority.

There are no cases determining the effect of section 47 upon the facts of the instant case. Section 47(a) provides that during the year that section 38 property is disposed of, the tax "shall be increased by an amount equal to the aggregate decrease in the *credits allowed under section 38 for all prior taxable years.*" (Emphasis supplied.) The statute does not provide for recapture equal to the aggregate decrease in total tax caused by taking ITC's. The plain meaning of the statute is that the recapture is to include all of the credits allowed under section 38 without any diminution because of the effect of the ITC on other taxes.

Petitioners have not suggested, nor are we aware of, any legislative history that contradicts the plain meaning of the statute. It appears that Congress never contemplated the effects on other taxes that ITC might have. Although Congress might have made a provision for recapture of only the net decrease in total taxes attributable to ITC, it did not.[38] Therefore, we hold for respondent on this issue.

In conclusion, we have found that sections 111, 58(h), and 47 do not provide petitioners with any statutory relief from the full recapture of the ITC's. In that tax credits are a matter of legislative grace (*Rickard v. Commissioner,* 88 T.C. at 196), and we have not been shown any authority for granting to petitioners relief from full recapture under section 47, we hold that petitioners are liable for the full amount of ITC recapture as determined by respondent and may not decrease their minimum tax liability on account of ITC's recaptured.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[38]We note that although petitioners must recapture ITC's as of 1977 and 1978, they are not taxed on the interest-free use of the ITC's, for which they received the bulk of the tax savings in 1975. When it enacted ITC in 1962, Congress was aware that the ITC recapture provisions provided for interest-free use of Government money between the year the ITC is taken and the year that it must be repaid via the recapture rules. See H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 418.