T.C. Memo. 2012-172

UNITED STATES TAX COURT

NA GENERAL PARTNERSHIP & SUBSIDIARIES, IBERDROLA
RENEWABLES HOLDINGS, INC. & SUBSIDIARIES (SUCCESSOR IN
INTEREST TO NA GENERAL PARTNERSHIP & SUBSIDIARIES), Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 525-10.                    Filed June 19, 2012.

<u>Miriam Louise Fisher</u>, <u>Brian C. McManus</u>, <u>Gary B. Wilcox</u>, and <u>Steven P.</u>
<u>Johnson</u>, for petitioner.

<u>Mary E. Wynne</u>, <u>James P. Thurston</u>, <u>Scott W. Mentink</u>, and <u>Shirley D. Chin</u>,
for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined deficiencies exceeding $188
million in petitioner's Federal income tax for taxable years ended March 31, 2001

(2001 tax year), March 31, 2002 (2002 tax year) and March 31, 2003 (2003 tax year) (collectively, years at issue).[1] The deficiencies concern $932 million of payments made on loan notes that NA General Partnership & Subsidiaries (NAGP) issued to its parent ScottishPower plc (ScottishPower). The sole question[2] is whether an advance made by ScottishPower to NAGP in connection with NAGP's acquisition of PacifiCorp & Subsidiaries (PacifiCorp) was a loan or a capital contribution for Federal tax purposes, and thus whether petitioner is entitled to interest expense deductions under sections 162(a)[3] and 163. We hold the advance was a loan, and the payments on the loan notes are deductible as interest.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate the Stipulation of Facts, the Supplemental Stipulation of Facts and the accompanying exhibits by this reference.

---

[1]All monetary amounts are rounded to the nearest million.

[2]All other issues either have been conceded or will follow from resolving the interest deduction issue.

[3]All section references are to the Internal Revenue Code (Code) for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

I. <u>Introduction to the Parties</u>

NAGP was a Nevada general partnership and elected to be treated as a corporation for Federal tax purposes. <u>See</u> sec. 301.7701-3(a), Proced. & Admin. Regs. NAGP maintained its principal place of business in Portland, Oregon at the time it filed the petition and filed consolidated Federal tax returns on the accrual basis for the years at issue.[4]

ScottishPower indirectly owned NAGP at all material times. ScottishPower was a publicly held "multi-utility business in the U.K.," with its principal office in Glasgow, Scotland. ScottishPower provided customers in Scotland, England and Wales with electric, gas, telecommunications and water services. ScottishPower organized NAGP as a special-purpose entity to acquire PacifiCorp.

PacifiCorp was a publicly held U.S. utility company and the common parent of a U.S. consolidated Federal income tax group that owned various regulated and nonregulated subsidiaries. PacifiCorp provided electricity and energy-related services to retail customers in several States, including Oregon, Utah, Washington, Idaho, Wyoming and California. PacifiCorp also indirectly owned interests in Australian companies. PacifiCorp owned 100% of Powercor Australia, Ltd.

---

[4]Iberdrola Renewables Holdings, Inc. & Subsidiaries, a Delaware corporation, became the successor in interest to NAGP in December 2003.

(Australia Powercor), an electric distribution company in Victoria, Australia, and 19.9% of the Hazelwood power station (Hazelwood), an adjacent brown coal mine in Victoria, Australia.

II. ScottishPower's Acquisition of PacifiCorp

A. ScottishPower Targets PacifiCorp

ScottishPower began exploring international acquisitions in the mid-1990s. ScottishPower's strategy group studied the U.S. utility industry and obtained advice from various advisers, including investment bankers and U.S. regulatory experts. PacifiCorp's stock in late 1998 was trading at approximately $19 per share (down sharply from over $27 per share a year earlier). PacifiCorp's stock had declined, in part, due to a failed acquisition attempt of its own and management turnover. There also was a general perception in the financial community that PacifiCorp had "taken its eye off the ball" of its core businesses in pursuing international expansion activities. ScottishPower believed that PacifiCorp had not paid sufficient attention to controlling its costs.

PacifiCorp was otherwise a highly valuable and respected company with an "A" debt rating, a good asset base with solid growth and demand for electricity, a consistent dividend-paying record and a strong presence in the western United

States.  In sum, ScottishPower viewed PacifiCorp as a sound company and ultimately an ideal acquisition target.

B.  Acquisition Preliminaries

In early July 1998 ScottishPower contacted PacifiCorp to discuss possibly strategically combining.  The parties discussed potential combination scenarios over the summer and early fall and eventually entered into a confidentiality and standstill agreement in October 1998.  Both companies commenced detailed due diligence and engaged numerous advisers to provide advice on financial, regulatory, tax and legal matters.  ScottishPower organized NAGP to serve as the acquirer of PacifiCorp, anticipating the proposed merger.

ScottishPower's management presented to its board of directors the results of their financial analysis, cost-savings projections and due diligence reviews of PacifiCorp.  ScottishPower's management ultimately advised its board that the merger would create significant value for ScottishPower's shareholders and recommended that ScottishPower proceed.  ScottishPower's board unanimously authorized the merger with PacifiCorp in December 1998.  Likewise, the PacifiCorp board of directors unanimously approved the proposed merger after PacifiCorp management and advisers made presentations.

ScottishPower, PacifiCorp and NAGP entered into a plan and agreement of merger in December 1998, which was later amended in January 1999 (merger agreement). ScottishPower would indirectly acquire 100% of PacifiCorp issued and outstanding common stock under the merger agreement. PacifiCorp common stock shareholders would receive ScottishPower American Depository Shares (ADS). Alternatively, PacifiCorp's common stock shareholders could elect to receive common shares of ScottishPower. The merger agreement further provided that NAGP would own PacifiCorp's shares and would issue loan notes to ScottishPower in consideration for the shares.

C. Acquisition Transaction

On November 19, 1999, ScottishPower and PacifiCorp completed their proposed merger under which PacifiCorp became a direct subsidiary of NAGP and an indirect subsidiary of ScottishPower (acquisition). To effect the acquisition, ScottishPower organized two wholly owned U.K. subsidiaries with an aggregate capital contribution of £100,000, NA1 Limited (NA1) and NA2 Limited (NA2). Both NA1 and NA2 were treated as disregarded entities for U.S. Federal income tax purposes. NA1 and NA2 contributed the £100,000 to NAGP in exchange for 10% and 90% of the interests in NAGP, respectively. NAGP formed a subsidiary corporation (ScottishPower Acquisition Co.) solely for the purpose of effecting the

acquisition. ScottishPower Acquisition Co. was merged with and into PacifiCorp under Oregon corporate law.

At closing, each outstanding share of PacifiCorp's common stock was cancelled and converted into the right to receive either ScottishPower ADS or ScottishPower shares. PacifiCorp issued new shares of common stock to NAGP. NAGP issued loan notes to ScottishPower equal to 75% of the ScottishPower ADSs and ScottishPower common shares provided to PacifiCorp's shareholders. NAGP also pledged its PacifiCorp shares as security for repayment. And NA1 and NA2 issued shares to ScottishPower representing 25% of the value of the ScottishPower ADSs and ScottishPower common shares provided to PacifiCorp's shareholders at the closing.

A new holding company for the combined group, New ScottishPower plc, was incorporated under the laws of Scotland in February 1999 also in connection with the acquisition. Under an arrangement, ScottishPower became a subsidiary of New ScottishPower plc. New ScottishPower plc was renamed ScottishPower plc and ScottishPower was renamed ScottishPower U.K. plc.

D.  Events After the Acquisition

1.  Insertion of PHI

ScottishPower and NAGP contemplated separating PacifiCorp's nonregulated subsidiaries from its regulated subsidiaries and placing them under a newly formed holding company before and after the acquisition.  To that end, ScottishPower decided to insert PacifiCorp Holdings, Inc. (PHI) as a holding company for PacifiCorp, PacifiCorp Group Holdings Company (PGHC) and PacifiCorp Power Marketing (PPM) a little over a year after the acquisition (PHI restructuring).

PHI was formed, and ScottishPower and PacifiCorp sought consent from the U.K. Treasury and U.S. State regulators to insert PHI and separate the regulated businesses from the nonregulated businesses.  NAGP transferred its PacifiCorp stock to PHI at the end of 2001, approximately a year after seeking regulatory approval.  PacifiCorp thereafter distributed PGHC to PHI, making PGHC and PacifiCorp brother-sister subsidiaries of PHI.

2.  Sale of PacifiCorp's Australian Operations

ScottishPower's management anticipated selling PacifiCorp's Australian operations, Australia Powercor and Hazelwood, before the acquisition.  Australia Powercor was eventually sold in September 2000, and PacifiCorp's subsidiary,

PGHC, received net cash proceeds from the sale of Australia Powercor of approximately $675 million. PGHC distributed $300 million of those proceeds as a dividend to Australia Powercor in March 2002. Hazelwood was sold in November 2000 for approximately $45.77 million.

III. Related-Party Financing at Issue

A. Loan Notes

As previously mentioned, NAGP issued loan notes to ScottishPower in consideration for ScottishPower transferring on behalf of NAGP its ADS shares and common shares to PacifiCorp shareholders in connection with the acquisition (advance). The loan notes consisted of $4 billion of fixed-rate loan notes (fixed-rate notes) and $896 million of floating-rate notes (floating-rate notes) to ScottishPower (collectively, loan notes or intercompany debt). Each loan note was evidenced by a certificate issued to ScottishPower. The fixed-rate notes had an interest rate of 7.3% and matured in November 2011. The floating-rate notes had an interest rate equal to LIBOR[5] plus 55 basis points and matured in November 2014. The fixed-rate notes and the floating-rate notes were each issued under separate loan

---

[5]"LIBOR" is an acronym for "London Interbank Offering Rate." See generally Bank One Corp. v. Commissioner, 120 T.C. 174, 189 (2003), aff'd in part, vacated in part, and remanded sub nom. J.P. Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006).

instruments and subject to separate conditions. The loan notes, however, were identical in all material respects except for the maturities, interest rates and principal values.

The loan notes shared many key terms. First, interest was payable quarterly in arrears. Second, the loan notes were unsecured and ranked equally and ratably with other debt obligations of NAGP. Third, ScottishPower, as the noteholder, could require NAGP to repay all or a portion of the loan notes at any time with proper notice. Fourth, NAGP had the right to redeem the loan notes without penalty at an agreed "market rate." Fifth, ScottishPower could require repayment of all the loan notes at market rate if any principal or interest was not paid within 30 days of the due date. Finally, the loan notes were transferable.

ScottishPower and NAGP both reflected the loan notes as debt on their books and records and tracked accruals and payments of interest on their books as well. Additionally, correspondence between the parties consistently recognized the loan notes as debt. Finally, the parties represented to the U.S. Securities and Exchange Commission that the loan notes were debt.

B. Interest Repayment

1. 2000 and 2001 Tax Years

NAGP failed to make the first and only interest payment due in the tax year ended March 31, 2000 (2000 tax year). Similarly, NAGP failed to make the first interest payment due in the 2001 tax year. NAGP ultimately paid $333 million of the $355 million interest it accrued on the loan notes for the 2001 tax year. PacifiCorp dividends were used to pay the interest.

2. 2002 Tax Year

ScottishPower suspended dividend payments from PacifiCorp during the 2002 tax year while regulatory approval was pending for inserting PHI as a holding company for PacifiCorp.[6] NAGP borrowed $186 million (short-term intercompany loan) from ScottishPower to fund the first two interest payments for the 2002 tax year. NAGP paid the first interest payment of $102 million from funds that ScottishPower actually transferred to it under the short-term intercompany loan. The second interest payment of $84 million, however, was

---

[6]ScottishPower was concerned with the U.K. and potential U.S. tax consequences from dividends to NAGP and consequently wanted NAGP to receive payments by way of a return of capital and not a dividend.

made through journal entries on the parties' books and records. No funds were actually transferred.

In addition, NAGP entered into a $360 million credit facility (RBS credit facility) with Royal Bank of Scotland (RBS) in late 2001. The RBS credit facility matured in March 2002 and subordinated ScottishPower's right to repayment of the loan notes to RBS. NAGP borrowed $273 million under the RBS credit facility in September 2001 and $84 million in November 2001. NAGP used the loan proceeds to repay the short-term intercompany loan and to fund additional interest payments on the loan notes while PacifiCorp's dividends remained suspended. NAGP fully repaid the advances against the RBS credit facility in the 2002 tax year after PHI distributed PacifiCorp dividends and proceeds from the sale of Australia PowerCor.

In total, NAGP made interest payments to ScottishPower totaling $357 million for the 2002 tax year, with payments exceeding accrued interest for the tax year. NAGP was in arrears of approximately $1 million at the end of the 2002 tax year.[7]

---

[7]NAGP reversed $113,804,708 of the accrued interest on the floating-rate notes in connection with its decision to capitalize them (discussed more fully below).

3.  2003 Tax Year

Finally, NAGP paid $241 million of interest on the fixed-rate notes for the 2003 tax year.  NAGP's interest obligations with respect to the loan notes were current at the end of the 2003 tax year.

Neither NAGP's nor ScottishPower's books and records allocated the amounts paid between the interest accrued on the fixed-rate notes and the floating-rate notes for either the 2001 tax year or the 2002 tax year.

C.  Capitalization of the Floating-Rate Notes

NAGP and ScottishPower decided in March 2002 to capitalize the floating-rate notes into equity after PricewaterhouseCoopers LLP (PwC) advised the parties that, at best, NAGP would be able to support the characterization of the $4 billion of fixed-rate notes as debt.  To that end, ScottishPower made contributions to NA1 and NA2.  In turn, NA1 and NA2 made contributions to NAGP.  NAGP used the contributions to fully retire the $896 million principal balance outstanding on the floating-rate notes.  NAGP recorded the elimination of the floating-rate notes on its books as additional paid-in capital of NA1 and NA2.

D.  Partial Capitalization and Repayment of the Fixed-Rate Notes

In December 2002 the parties decided to partially capitalize and repay the fixed-rate notes as part of a restructuring of the NAGP consolidated group (U.S.

restructuring). The U.S. restructuring was in response to a proposed regulation under section 894 that would characterize interest payments NAGP made to ScottishPower under the existing structure as nondeductible dividends and subject them to a 5% withholding tax. Additionally, the existing structure was also becoming less efficient because ScottishPower had mostly exhausted its foreign tax credits, creating potentially increased U.K. tax obligations on dividend payments from the U.S.

ScottishPower arranged for a daylight borrowing facility of $2.376 billion with RBS in early December 2002 to effect the U.S. restructuring. NAGP received $2.375 billion from PHI as payment for certain PHI shares the same day and after the daylight borrowing facility funds moved through a series of transactions connected with the U.S. restructuring. NAGP then paid $2.375 billion to ScottishPower to partially repay the fixed-rate notes. At the end of the day, ScottishPower repaid the daylight borrowing facility from RBS using the $2.375 billion received as partial repayment of the $4 billion fixed-rate notes. Also that same day, NAGP capitalized into equity the remaining portion of the fixed-rate notes.

## IV. Tax Returns

NAGP timely filed consolidated Federal income tax returns for the years at issue, claiming interest expense deductions with respect to the loan notes, totaling $932 million. Respondent disallowed the interest expense deductions, claiming the advance should be characterized as a capital contribution, not a loan, for Federal tax purposes. Petitioner timely filed the petition.

## OPINION

## I. Introduction

We must decide whether NAGP is entitled to deduct as interest under sections 162 and 163(a) payments made to its parent, ScottishPower, totaling $932 million. Resolving this question turns on whether the advance by ScottishPower of its stock to NAGP in connection with the acquisition of PacifiCorp is properly characterized as a loan or a capital contribution.[8] Respondent argues the advance was a capital contribution, i.e., equity, and the payments therefore constitute dividends or returns of capital. Petitioner argues the advance was a loan, i.e., debt,

_____

[8]The taxpayer generally bears the burden of proving the Commissioner's determinations are erroneous. Rule 142(a). The burden of proof may shift to the Commissioner if the taxpayer satisfies certain conditions. Sec. 7491(a). We resolve the issues here on a preponderance of the evidence, not on an allocation of the burden of proof. Therefore, we need not consider whether sec. 7491(a) would apply. See Estate of Black v. Commissioner, 133 T.C. 340, 359 (2009).

and the payments therefore are deductible as interest. We now turn to whether the advance was debt or equity.

II. Debt Versus Equity

A transaction's substance, not its form, controls its effect for tax purposes. See Hardman v. United States, 827 F.2d 1409, 1411 (9th Cir. 1987). Nevertheless, tax consequences are a significant consideration in many commercial transactions, and planning a legitimate transaction to take advantage of tax benefits does not invalidate the transaction. Id.

An appeal in this case lies, unless otherwise stipulated, to the United States Court of Appeals for the Ninth Circuit. We shall therefore follow the approach taken in the Ninth Circuit. The Court of Appeals for the Ninth Circuit considers eleven factors to determine whether an advance is debt or equity. These factors include (1) the name given to the documents evidencing the indebtedness; (2) the presence of a fixed maturity date; (3) the source of the payments; (4) the right to enforce payments of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money and (11) the corporation's ability to obtain loans from outside lending institutions. Hardman, 827 F.2d at 1412.

No one factor is decisive, and the weight given to each factor depends on the facts and circumstances. Id. Our objective is not to count the factors, but rather to evaluate them. See Laidlaw Transp., Inc. v. Commissioner, T.C. Memo. 1998-232. We now evaluate the eleven factors to determine the proper tax characterization of the advance.

### 1. Document Labels

The first factor in a debt-equity analysis focuses on the type of certificate the parties use to evidence the advance. Hardman, 827 F.2d at 1412. The issuance of a debt instrument such as a promissory note supports the characterization of an instrument as debt. See Estate of Mixon, 464 F.2d 394, 403 (5th Cir. 1972); Anchor Nat'l Life Ins. Co. v. Commissioner, 93 T.C. 382, 405 (1989). In contrast, the issuance of an equity instrument such as a stock certificate supports an equity characterization. Id.; see also Estate of Mixon v. United States, 464 F.2d at 403; Anchor Nat'l Life Ins. Co. v. Commissioner, 93 T.C. at 405.

Here, NAGP issued ScottishPower certificates called "Fixed-Rate Loan Notes" and "Floating-Rate Loan Notes." The loan note designation implies the certificates were akin to debt. Moreover, the loan notes contained terms and conditions typical of a promissory note.

This factor supports characterizing the advance as debt.

2. Fixed Maturity Date

The second factor in the debt-equity analysis examines whether repayment of the advance was required by a fixed maturity date. Hardman, 827 F.2d at 1413. The presence of a fixed maturity date for repayment indicates a fixed obligation to repay and supports a debt characterization. Id.; Estate of Mixon, 464 F.2d at 404; Anchor Nat'l Life Ins. Co. v. Commissioner, 93 T.C. at 405. The absence of the same, however, indicates that repayment of the advance depends on the success of the business and favors an equity finding. Hardman, 827 F.2d at 1413; Estate of Mixon, 464 F.2d at 404; Anchor Nat'l Life Ins. Co. v. Commissioner, 93 T.C. at 405.

Here, the loan notes had specified maturity dates. Accordingly, ScottishPower had an unconditional right to demand repayment of the intercompany debt.

This factor supports characterizing the advance as debt.

3. Source of Payments

The third factor in the debt-equity analysis is the source of payments on the advance. Hardman, 827 F.2d at 1413. An equity investment is indicated where

repayment depends on earnings or is to come from a restricted source.[9]  Id.; Estate of Mixon, 464 F.2d at 405; Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 287-288 (1990).  In such a case, the purported lender acts "'as a classic capital investor hoping to make a profit, not as a creditor expecting to be repaid regardless of the company's success or failure.'"  Calumet Indus., Inc. v. Commissioner, 95 T.C. at 287-288 (quoting In re Larson, 862 F.2d 112, 117 (7th Cir. 1988)).

Here, NAGP was contractually obligated to pay the full principal amounts of the loan notes at set maturity dates, notwithstanding its earnings.  Moreover, petitioner's expert, Israel Shaked, concluded that PacifiCorp had reasonably anticipated cashflows at the time of the acquisition to pay NAGP (a holding company) dividends sufficient for NAGP to timely service and retire the intercompany debt as it became due.[10]  Mr. Shaked also concluded that NAGP

---

[9]This factor is somewhat anomalous because bona fide loans are often repaid out of corporate earnings.  See Estate of Mixon v. United States, 464 F.2d 394, 405 n. 15 (5th Cir. 1972).

[10]ScottishPower developed a valuation model, Ex. 7-J, that included a 10-year cashflow forecast for PacifiCorp in connection with their evaluation of PacifiCorp as an acquisition target.  ScottishPower updated the valuation model shortly before the acquisition closed (1999 projections) for review by ScottishPower and PacifiCorp.  Mr. Shaked relied principally on the 1999 projections in reaching his conclusion.

could have likely refinanced the intercompany debt if NAGP had been unable to fully repay it when due. We accept Mr. Shaked's conclusions.

Respondent's expert, Robert Mudge, also analyzed NAGP's ability to repay the intercompany debt. He concluded that NAGP would have had a substantial cash shortfall when the fixed-rate notes matured. Mr. Mudge's repayment analysis excludes, however, substantial expected proceeds from the sale of PacifiCorp's Australian operations, which Mr. Mudge acknowledges the relevant parties contemplated at the time of the acquisition. Mr. Mudge assumes that NAGP would have used the sale proceeds to issue ScottishPower a dividend rather than repaying the intercompany debt. This assumption, however, is not supported by the record. We therefore place less weight on his conclusions.

Respondent also contends regulatory restrictions limited the amount of dividends that PacifiCorp could pay to NAGP. Respondent cites various regulations, but only a restriction the Public Utility Commission of Oregon (OPUC restriction) imposed actually affected PacifiCorp's ability to make distributions to NAGP. The OPUC restriction prohibited PacifiCorp from making any distribution that would reduce PacifiCorp's common equity ratio below certain annual thresholds ranging from 35% to 40% from 1999 to 2007. We note, however, that the OPUC restriction applied only to PacifiCorp's regulated operations in Oregon. This would not have

prevented PacifiCorp from maintaining a lower common equity ratio with respect to operations in other States and countries. More generally, the record does not reflect that the OPUC restriction or any other regulatory restriction was a serious impediment to PacifiCorp paying NAGP dividends sufficient to timely service and retire the intercompany debt. Thus, the record reflects that repayment was not contingent on earnings.

This factor supports characterizing the advance as debt.

4. Right To Enforce Payment of Principal and Interest

The fourth factor in a debt-equity analysis focuses on the right to enforce payment of principal and interest. Hardman, 827 F.2d at 1413. A definite obligation to repay is evidence of debt. Id. A lack of security for repayment of purported debt generally supports an equity characterization. See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 381 (1973); Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548. Security is less important, however, in the related-party context. See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 381 (1973); Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548.

NAGP was contractually obligated to pay interest and principal owing on the intercompany debt by specified dates. If NAGP failed to pay any interest or principal within 30 days of its being due, ScottishPower could require repayment of

the full amount of the intercompany debt.  Moreover, NAGP pledged its PacifiCorp stock as security for the intercompany debt.[11]  We find that ScottishPower had an unconditional right to enforce payment of the intercompany debt.

This factor supports characterizing the advance as debt.

5.  Participation in Management

The fifth factor in a debt-equity analysis is whether the person making an advance increases his or her management rights.  Hardman, 827 F.2d at 1413.  An increased right to participate in management resulting from an advance contributes to an equity finding.  Id.  ScottishPower was effectively NAGP's sole owner when it advanced the PacifiCorp shares to NAGP and thus did not increase, nor could have increased its right to participate in management as a result of the advance.

This factor is neutral.

6.  Status Equal to or Inferior to That of Regular Corporate Creditors

The sixth factor applied in characterizing an advance as debt or equity considers whether the person making the advance has equal or inferior rights to those of a regular corporate creditor.  Id.  Subordinating a purported creditor's right to

---

[11]We disagree with respondent that the pledge agreement was mere "window dressing."  Regardless, the importance of the pledge agreement here is minimal as ScottishPower effectively controlled the PacifiCorp shares that NAGP held.  See supra p. 21.

repayment to that of other creditors supports an equity characterization.  Id. Nevertheless, subordination does not necessarily indicate equity when an advance is given priority over the claims of shareholders.  Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548; see also Estate of Mixon, 464 F.2d at 406.

The loan notes did not subordinate ScottishPower's right to repayment to that of other creditors.  Respondent argues, however, that the advance resembles equity more than debt because the loan notes did not restrict NAGP from taking on more senior debt, and NAGP did in fact subordinate ScottishPower's right to repayment when obtaining the RBS credit facility.

We are not persuaded by respondent's argument.  We have recognized that certain creditor protections are not as important in the related-party context.  For example, we have previously found that a parent's 100% ownership interest in its subsidiary adequately substituted for a security interest, or at least minimized its importance.  Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 381.  Similarly, ScottishPower as NAGP's sole shareholder had the power to prevent NAGP from taking on any additional debt, including senior debt.

Further, we find that subordination of Scottish Power's right to repayment was not significant under the circumstances.  NAGP obtained the RBS credit facility to pay interest to ScottishPower on the loan notes while PacifiCorp delayed paying

dividends in connection with the PHI restructuring.  Moreover, NAGP reasonably expected PacifiCorp to pay a dividend sufficient to repay the RBS credit facility on or before its maturity, which was within the same tax year that NAGP entered into the RBS credit facility.

Respondent also argues that ScottishPower's right to repayment was structurally subordinated to rights of PacifiCorp's creditors and therefore inferior to that of a regular creditor.  We disagree.  Courts have long recognized that certain types of subordination to other creditors are not so unusual as to cast doubt on the bona fides of the purported debt.  See, e.g., Liflans Corp. v. United States, 390 F.2d 965, 971 (Ct. Cl. 1968); Jack Daniel Distillery v. United States, 379 F.2d  569, 582 (Ct. Cl. 1967); Tomlinson v. 1661 Corp., 377 F.2d 291, 298 (5th Cir. 1967); Alstate-Schuylkill Co. v. Commissioner, T.C. Memo. 1969-9; see also Fin Hay Realty Co. v. United States, 398 F.2d 694, 702-703 (3d Cir. 1968) (Van Dusen, J., dissenting).  With holding companies, any debt issued is necessarily subordinated to the creditors of its operating company.  Accordingly, this type of subordination is to be expected and does not in and of itself cast doubt on the legitimacy of debt issued by a holding company.

This factor supports characterizing the advance as debt.

7. Parties' Intent

The seventh factor is whether the parties intended the advance to be debt or equity. Hardman, 827 F.2d at 1413. Here, the record contains substantial objective evidence showing NAGP and ScottishPower intended to create a debtor-creditor relationship. The loan notes were in the form of debt, provided for interest payments, had stated maturity dates and were not subordinated to general creditors. NAGP and ScottishPower recorded the loan notes as debt on their books and records at all times relevant, and correspondence between the parties consistently recognized the loan notes as debt. Finally, the parties represented to the SEC that the loan notes were debt.

We discredit respondent's argument that ScottishPower capitalized NAGP with the intercompany debt primarily to obtain interest expense deductions. Respondent posits that NAGP had tax avoidance motives indicating that the advance was really an equity investment. See, e.g., Gilbert v. Commissioner, 248 F.2d 399 (2d Cir. 1957), rev'g and remanding T.C. Memo. 1956-137. NAGP's desire to minimize tax is not conclusive, however, of the characterization of the advance as debt or equity. See Kraft Foods Co. v. Commissioner, 232 F.2d 118, 128 (2d Cir. 1956). Indeed, tax considerations permeate the decision to capitalize a business enterprise with debt or equity. Interest paid on indebtedness is deductible while no

deduction is allowed for dividends paid.  Moreover, ScottishPower's desire to obtain interest expense deductions in capitalizing NAGP with debt does not show that the parties lacked the requisite intent to enter into a debtor-creditor relationship, as respondent implies.  If anything, it shows the opposite.

We also discredit respondent's additional arguments that the parties' post-acquisition conduct demonstrates they lacked the requisite intent to form a genuine debtor-creditor relationship.  First, respondent argues that certain instances of NAGP's failing to timely pay interest and incurring arrears, and ScottishPower's allowing of the same, indicates a lack of intent between the two to create a debtor-creditor relationship.  While not exemplary, this conduct falls short of establishing that the parties never intended to form a debtor-creditor relationship.  We are mindful that a true lender is concerned with interest and that failure to insist on payment of interest may indicate that a purported lender expects to be repaid out of earnings. See CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16.  We are also mindful, however, that strict insistence on payment when due is not expected and consistent with business realities in the related-party context.  See Wilshire & W. Sandwiches, Inc. v. Commissioner, 175 F.2d 718, 720-721 (9th Cir. 1949) (stating no adverse inference should be drawn from a party's failing to demand payment

immediately when due from a related party), rev'g a Memorandum Opinion of this Court.

The record reflects that NAGP took seriously its obligation to pay interest. NAGP made regular payments by or near the interest payment dates, with the exception of the first two interest payments being untimely. Additionally, NAGP paid all or substantially all accrued interest for each tax year that the loan notes were outstanding. The only exception is the 2000 tax year, during which one interest payment was due, which ended a little over a month later.

Second, respondent argues that ScottishPower's short-term intercompany loan of $186 million to NAGP to fund interest payments on the loan notes in the 2002 tax year shows that the parties did not intend a debtor-creditor relationship. We disagree. We have previously held that an advance from a parent corporation to its subsidiary may be characterized as debt even though the parent makes subsequent readvances to cover interest on the initial advance. See Litton Bus. Sys. Inc. v. Commissioner, 61 T.C. at 380; Nestle Holdings, Inc. v. Commissioner, T.C. Memo. 1995-441, vacated and remanded on another issue, 152 F.3d 83 (2d Cir. 1998). Salient to our findings in these cases was that each taxpayer reduced its overall related-party indebtedness despite the advance and continued paying interest. Id. In contrast, we have held that a parent's funding of interest owed it on a purported

related-party loan supports a finding of equity where substantially all the interest payments were made through circular cashflows and did not change the parties' financial positions. See Laidlaw Transp., Inc. v. Commissioner, T.C. Memo. 1998-232.

The facts here are more similar to those in Litton Bus. Sys. and Nestle Holdings, Inc. than those in Laidlaw Transp., Inc. NAGP paid the first two intercompany interest payments for the 2002 tax year with the short-term intercompany loan because of a delay in dividend payments from PacifiCorp pending the PHI restructuring. The same tax year NAGP used funds it had borrowed under the RBS credit facility to repay the short-term intercompany loan, as well as make additional interest payments. The net result for the 2002 tax year was payment of all accrued interest on the loan notes for the tax year and no increase in NAGP's related-party indebtedness to ScottishPower. Moreover, NAGP continued to make interest payments and eventually retired a substantial portion of the fixed rate notes pursuant to the U.S. restructuring. We do not draw any adverse inference that NAGP failed to reduce the principal amount of the intercompany debt during the years at issue as no principal payments were due. Thus, like the taxpayers in Litton Bus. Sys. and Nestle Holdings, Inc., NAGP continued to pay interest and principal despite the readvance.

Additionally, unlike the payments in <u>Laidlaw Transp., Inc.</u>, payment of interest through the short-term intercompany loan did not result in circular cashflows and actually affected NAGP's financial position. Indeed, NAGP repaid the short-term intercompany loan with funds from the RBS credit facility, which it fully repaid in March 2002 with funds it received from a PacifiCorp distribution.

Third, respondent argues that NAGP's capitalization of the floating-rate notes and its partial capitalization of $1.625 billion of the fixed-rate notes demonstrate that NAGP and ScottishPower never intended a true debtor-creditor relationship. Again, we are not persuaded. We recognize that payment of principal is strong evidence that parties intended a debtor-creditor relationship. <u>See</u> <u>Jack Daniel Distillery</u>, 379 F.2d at 583. Capitalization of debt to equity, however, does not necessarily preclude a finding of debt. <u>See</u> <u>Deseret News Publ'g Co. v. Commissioner</u>, T.C. Memo. 1975-156. For example, we have held that capitalization of a portion of debt in response to a new business circumstance does not indicate the capitalized portion of debt or remaining debt was an equity investment. <u>Id.</u> The fundamental inquiry is whether the capitalization of the purported debt represents a change in the parties' intentions or the mere recognition of a longstanding intent that the purported debt be an equity investment. <u>Id.</u>

Regarding the floating-rate notes, the parties received advice from PwC during the 2002 tax year that NAGP could not likely support a debt characterization of more than $4 billion of the intercompany debt.  The record reflects that based upon this advice, NAGP decided to capitalize the entire original principal balance of the floating-rate notes.  We are not convinced that the parties' decision to capitalize the floating-rate notes in response to the PwC advice demonstrates that the parties always intended the floating-rate notes to be an equity investment.

Regarding the partial capitalization of the fixed-rate notes, PwC also advised that ScottishPower's U.S. consolidated group should be restructured.  PwC advised restructuring because proposed changes to U.S. tax regulations under section 894 would significantly increase the tax cost of the existing structure.  In response to this advice, the parties capitalized into equity $1.625 billion of the fixed-rate notes in connection with the U.S. restructuring.  As with the floating-rate notes, we are not convinced that the parties' capitalizing a portion of the fixed-rate notes based on PwC's advice demonstrates that the parties always intended for the floating-rate notes to be an equity investment.

Finally, respondent argues that NAGP's repayment of the remaining $2.375 billion was in substance a capitalization of that portion of the fixed-rate notes, thus

showing that the parties always intended for the fixed-rate notes to be equity. Here, NAGP repaid the remaining principal balance of the fixed-rate notes, $2.375 billion, with funds that originated from ScottishPower and that were transferred to NAGP through a series of transactions done in connection with the U.S. restructuring. While the funds originated with ScottishPower, they were actually transferred to NAGP, and respondent has not argued nor established that the U.S. restructuring or the different transactions through which the funds were transferred to NAGP lacked economic substance or should otherwise be recharacterized or disregarded. Accordingly, we respect the form of the parties' transactions. We do not find that the manner in which NAGP received the funds used to repay the $2.375 billion of fixed-rate notes rendered such repayment meaningless.

In sum, NAGP's post-acquisition conduct is not fatal to its otherwise established intent to form a true debtor-creditor relationship.

This factor supports characterizing the advance as debt.

8. Inadequate Capitalization

The eighth factor in determining whether an advance is debt or equity concerns the sufficiency of the purported debtor's capitalization. Hardman, 827 F.2d at 1414. Inadequate capitalization indicates that an advance is equity. Id. The purpose of this factor is to gauge the risk associated with repayment of the purported

loan.  Bauer v. Commissioner, 748 F.2d 1365, 1369 (9th Cir. 1984), rev'g T.C. Memo. 1983-120.  Capital adequacy, however, must not be viewed in a vacuum. The debt to equity ratio that is adequate in one industry may be inadequate in another.  See, e.g., Scotland Mills, Inc. v. Commissioner, T.C. Memo. 1965-48.  For example, companies with high levels of business risk, such as those in highly uncertain environments (e.g., high-tech) or in cyclical or volatile industries generally cannot bear the risk of significant leverage.  The opposite is true generally for companies with low business risk (e.g., utilities).

The parties' experts agree on how to evaluate the adequacy of NAGP capital structure.  They say we should look at NAGP and PacifiCorp on a consolidated basis.  We agree.

Petitioner's expert, Mr. Shaked, calculated the debt to total capitalization ratio to evaluate NAGP and PacifiCorp's leverage on a consolidated basis.  He determined that the ratio would peak at 82% immediately after the acquisition and then gradually decline as NAGP paid down the intercompany debt.  Mr. Shaked also compared the leverage ratio of NAGP to the leverage ratios of similarly situated utilities that made large acquisitions near the time of the acquisition.  He concluded that large, highly leveraged transactions similar to ScottishPower's acquisition of PacifiCorp occurred and were funded by third-party lenders.  Mr. Shaked also

analyzed NAGP's equity value; i.e., the fair market value of its assets less the face value of its debts using a market-based approach and a discounted cashflow approach. He concluded under both analyses that NAGP had significant positive equity value at the time of the acquisition.

Respondent argues, relying on his expert Mr. Mudge, that NAGP would have likely been rated below investment grade by an independent rating agency such as Standard & Poor's (S&P), and that this establishes NAGP was thinly capitalized. We disagree. Both Mr. Mudge and petitioner's expert William Chambers opined on the credit rating that likely would be assigned to NAGP under the S&P credit rating system at the time of the acquisition. Mr. Chambers determined that NAGP would be assigned a rating of "BB+." Mr. Mudge determined that NAGP would receive a lower credit rating of "B." We agree with Mr. Chambers that Mr. Mudge's assigned rating is flawed because it fails to take into account NAGP's business risk.[12]

Nevertheless, respondent's argument still fails even assuming NAGP would have actually been assigned a "B" credit rating. A "B" rating does not indicate

---

[12]We more specifically agree with Mr. Chambers that a company's business risk is a fundamental component that must be examined in determining a credit rating for a company.

imminent distress or bankruptcy.  Rather, as acknowledged by Mr. Mudge in his expert report, a "B" rating under S&P's credit rating system indicates that a company has the current capacity to meet financial commitments, with a certain amount of vulnerability to adverse business, financial and economic conditions. Accordingly, we do not find that a "B" rating establishes that NAGP was so thinly capitalized that it would be unable to repay the intercompany debt.

This factor supports characterizing the advance as debt.

### 9.  Identity of Interest Between Creditor and Sole Shareholder

The ninth factor to analyze whether an advance is debt or equity looks at whether the advance was made by a sole shareholder.  Hardman, 827 F.2d at 1414. A sole shareholder's advance is more likely committed to the risk of the business than an advance from a creditor who is not a shareholder.  G.-Pac. Corp. v. Commissioner, 63 T.C. 790, 797 (1975); see also CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16.  ScottishPower was NAGP's sole shareholder when it advanced the ScottishPower shares to NAGP.

This factor supports characterizing the advance as equity.

### 10.  Payment of Interest Only Out of Dividends

The tenth factor in analyzing whether an advance is debt or equity involves the source of interest payments.  Hardman, 827 F.2d at 1414.  The presence of an

obligation to pay interest and actual interest payments indicate an advance is debt. In contrast, a lack of interest payments indicates equity. Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 604 (1991); Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548. The fixed and floating-rate notes both required NAGP to pay interest periodically. Moreover, as previously mentioned, NAGP had sufficient anticipated cashflow to make the required interests payments and actually made regular interest payments, paying substantially all accrued interest during each year at issue.

This factor supports characterizing the advance as debt.

11. Ability To Obtain Loans From Outside Lending Institutions

The eleventh factor evaluates whether the purported debtor could have obtained comparable financing. Hardman, 827 F.2d at 1414. This factor is relevant in measuring the economic reality of a transfer. Estate of Mixon, 464 F.2d at 410. Evidence that the purported debtor could have obtained loans from outside sources points toward debt. Hardman, 827 F.2d at 1414. Evidence that the taxpayer could not obtain loans from independent sources points toward equity. Id.; Calumet Indus., Inc. v. Commissioner, 95 T.C. at 287. We have recognized that the lender in the related-party context may understandably offer more flexible terms than could be obtained elsewhere. See C.M. Gooch Lumber Sales Co. v. Commissioner, 49 T.C.

649, 659 (1968), remanded on a different issue, 406 F.2d 290 (6th Cir. 1969).  We look to whether the terms of the purported debt were a "patent distortion of what would normally have been available" to the debtor in an arm's-length transaction. See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 379; Nestle Holdings, Inc. v. Commissioner, T.C. Memo. 1995-441; cf. Segel v. Commissioner, 89 T.C. 816, 832-834 (1987) (stating that the touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms).

Both respondent's and petitioner's experts analyzed whether NAGP could have obtained comparable financing with respect to the advance.  Respondent's expert, Mr. Mudge, concluded that NAGP could not have obtained comparable financing.  The question he sought to answer, however, was whether NAGP could have obtained financing from third-party creditors on the same terms and at the same price.  The requirement of precise matching misses the mark.  See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 379 (declining to apply a mechanical test of absolute identity between the advance and what debt actually or hypothetically would have been available to the taxpayer); cf. Segel v. Commissioner, 89 T.C. at 832-834.  We therefore give little weight to Mr. Mudge's conclusions.

Petitioner's expert Charles Chigas, on the other hand, concluded that fixed-rate notes would have been purchased by third-party fixed-income investors on substantially similar terms as the $4 billion fixed-rate notes. He determined that the interest rate in the market would have been slightly higher, but the transaction could have been sold in the debt capital markets to third-party investors. Mr. Chigas' rationale relies on information including comparable debt issuances at the time and the stable credit profile of electric utilities issuers. Mr. Chigas considers a different method of lending and acknowledges that the debt capital markets would have required a slightly higher rate. Nevertheless, we find that the terms of the fixed-rate notes were not a "patent distortion" of what NAGP could have otherwise borrowed.

The record is void of any facts to persuade us that NAGP could have obtained financing from an unrelated party comparable to the terms of the $896 million in floating-rate notes. Mr. Chigas indicates that including the floating-rate notes would not change his conclusions regarding the fixed-rate notes. He reaches this conclusion by noting that, if including the floating-rate notes would have resulted in a rating downgrade for all of the loan notes such that they would be below investment grade, then he would have recommended dividing the debt offering into senior and subordinate tranches. Accordingly, we find that this factor favors characterizing the

fixed-rate notes as debt and is neutral regarding the characterization of the floating-rate notes.

III. Conclusion

We recognize that there are features in this case pointing to both debt and equity. Nevertheless, in view of the record as a whole, we find that the advance was more akin to debt than equity. We did not rely on any single overriding factor. Rather, we find that the whole of this case is more reflective of the true relationship between the parties than the individual parts. We therefore hold that the payments of interest made with the respect to the loan notes are deductible as interest for each year at issue.

We have considered all remaining arguments the parties made and, to the extent not addressed, we find them to be irrelevant, moot or meritless.

To reflect the foregoing,

Decision will be entered for petitioner.