T.C. Memo. 2015-111

UNITED STATES TAX COURT

J. MICHAEL BELL AND SANDRA L. BELL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MBA REAL ESTATE, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 11917-12, 11918-12.      Filed June 15, 2015.

Perry D. Popovich, for petitioners.

Chong S. Hong, for respondent.

MEMORANDUM OPINION

HAINES, Judge:  These cases before the Court are consolidated for
purposes of trial, briefing, and opinion.  J. Michael Bell and Sandra L. Bell (Bells)
and MBA Real Estate, Inc. (MBA), separately petitioned the Court for
redetermination of the following deficiencies in Federal income tax:

[*2]

| Petitioner | Year | Deficiency |
|---|---|---|
| J. Michael Bell and Sandra L. Bell, docket No. 11917-12 | 2008 | $4,682 |
| | 2009 | 13,281 |
| | 2010 | 6,813 |
| MBA Real Estate, Inc., docket No. 11918-12 | 2008 | $15,468 |
| | 2009 | 45,013 |
| | 2010 | 6,720 |

Hereinafter, 2008, 2009, and 2010 will be referred to as the years at issue. After concessions, the issues for decision are: (1) whether the issuance of the notices of deficiency for 2008 is barred by the expiration of the limitations period for assessment pursuant to section 6501[1] and (2) whether the Bells' transfer of assets to MBA was a sale or a capital contribution.

Background

These cases were submitted to the Court fully stipulated pursuant to Rule 122. The parties' stipulations of facts, with attached exhibits, are incorporated herein by this reference. When the petitions were filed, the Bells lived in California and MBA's principal place of business was in Santa Clara, California.

During the years at issue the number of defaults on loans secured by residential real estate in California increased dramatically because of the Great

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] Recession. During this time a property's fair market value was often less than the amount owed to the lender. As a result, lenders acquired at foreclosure sales many of the residential properties securing their loans and attempted to resell the properties at higher prices. These types of properties are known as "real estate owned properties" (REO). Some lenders serviced their own REO portfolios while others relied on third parties for these services.

During the years at issue Mr. Bell was a licensed real estate broker and Mrs. Bell was a certified real estate appraiser and a licensed real estate sales agent. By 2007 Mr. Bell had completed training and had obtained the necessary certifications to join networks of brokers who assisted lenders with their REO portfolios. The assistance consisted, among other things, of providing an estimate of the value of the residential real estate securing the loan before a foreclosure sale. If the lender acquired the real estate at the foreclosure sale and the property was occupied, the broker assisted in repossessing the property for the lender and overseeing the cleaning, repair, and maintenance of the property in anticipation of a subsequent sale. The lender then signed a listing agreement with the broker authorizing the latter to sell the property. Other than nominal consideration for the preforeclosure estimate of value and reimbursement for any expenses related to the

[*4] cleaning, maintenance, and repair of the property, the broker's compensation was principally the commission paid when the property was sold to a third party.

Before the years at issue and until September 1, 2008, Mr. Bell operated his real estate business as a sole proprietorship under the trade name Realty World MBA. The proprietorship was reported as Michael Bell & Associates on the Bells' 2008 Federal income tax return. As a result of the increase in his REO business, Mr. Bell incorporated his business by filing MBA's articles of incorporation on August 4, 2008. On the same day the Bells and MBA executed a lease for the business' office. Shortly thereafter, MBA renewed Mr. Bell's franchise license agreement with Realty World-Northern California, Inc., for a renewal fee of $250. MBA's organization minutes were signed one month after the articles of incorporation were filed, appointing Mr. Bell president and treasurer and Mrs. Bell vice president and secretary. At approximately the same time the board of directors authorized MBA to broker real estate under Mr. Bell's license and to purchase Mr. Bell's sole proprietorship.

MBA and Mr. Bell entered into a purchase agreement on October 1, 2008. For $225,000, Mr. Bell agreed to sell MBA "[a]ll the work in process, customer lists, contracts, licenses, franchise rights, trade names, goodwill, and other tangible and intangible assets of that business known as 'Realty World - MBA'". When

[*5] the purchase agreement was signed, MBA had no capital, no assets, and no shareholders. Weeks after the purchase agreement was signed, MBA's board of directors resolved to issue 250 shares to Mr. Bell and 250 shares to Mrs. Bell in exchange for $500.

No appraisal was performed. The $225,000 purchase price was determined exclusively by the Bells. The Bells allocated $25,000 of the purchase price to the five-year franchise license agreement Mr. Bell entered into with Realty World-Northern California, Inc., in 2004 for $3,200. The remaining $200,000 of the purchase price was allocated to 40 contracts between Mr. Bell and various lenders and entities to assist during the REO process. The property subject to 1 of the 40 contracts was sold before September 1, 2008, and the Bells received a payment of $10,800 for services rendered pursuant to the contract on September 3, 2008. On September 4, 2008, MBA booked a $10,800 account receivable for this contract. When the purchase agreement was entered into, the other 39 contracts required additional services by Mr. Bell; and there was no certainty that these contracts would produce income.

The purchase agreement states that the purchase price was payable in monthly installments of $10,000 or more on the first of each month and that the unpaid principal amount was subject to 10% interest each year. MBA did not

[*6] provide any security for the purchase price, and a promissory note was not executed. The purchase price was eventually paid in full, but MBA did not make all payments timely.

On their returns for the years at issue the Bells reported a $5,000 cost basis in the Realty World franchise and reported long-term capital gain from the transaction using Form 6252, Installment Sale Income. The Bells also reported the following amounts as interest payments: $4,688 for 2008, $11,250 for 2009, and $4,500 for 2010. MBA reported substantially the same amounts as interest payments on its returns for the years at issue. MBA amortized the $225,000 purchase price over five years.

MBA accrued $133,063.60 of current earnings and profits (E&P) in 2008. Following the $45,312 distribution to the Bells, MBA had $87,751.60 of accumulated E&P at the end of 2008. In 2009 MBA accrued current E&P of $178,790.60. Following the $108,750 distribution to the Bells, MBA had an accumulated E&P of $157,792.20 at the end of 2009. MBA accrued current E&P of $37,562.60 in 2010. MBA's current E&P for 2010 and its accumulated E&P of $157,792.20 exceeded the $53,000 distributed to the Bells in 2010.

The Bells' 2008 return was due by April 15, 2009. It was not filed until June 20, 2009. MBA's 2008 tax return was due by March 15, 2009. It was mailed

[*7] on March 14, 2009, and was received on March 22, 2009.[2]  On February 7, 2012, respondent sent notices of deficiency for the years at issue to the Bells and MBA by certified mail, determining that the Bells' entire gain from the sale was ordinary income and that MBA should have amortized the purchase price over 15 years.

Before trial the Court granted respondent's motion for leave to file an amendment to the answer.  In the amended answer respondent argues that the transfer of the sole proprietorship's assets to MBA was a capital contribution subject to section 351, not a sale.  Respondent argues that payments made to the Bells were in fact dividends and that the assets transferred to MBA may not be amortized or depreciated.

## Discussion

### I.  Whether We May Determine Whether a Deficiency Exists for 2008

#### A.  The Bells

The Bells' petition asserts that the statute of limitations bars respondent from assessing or collecting any deficiency for 2008.  The Bells' 2008 return was due by April 15, 2009, but it was not filed until June 20, 2009.  The statutory

---

[2]A Form 1120X, Amended U.S. Corporation Income Tax Return, for 2008 was completed and presented to respondent during the examination but was not filed.

[*8] notice of deficiency for 2008 was sent to the Bells via certified mail on February 7, 2012.

Section 6501(a) generally requires that taxes be assessed within three years after a return is filed. The Commissioner, however, is generally precluded from making an assessment until a notice of deficiency is mailed to the taxpayer, during the period when a taxpayer may file a petition with this Court, and, if a petition is filed, until this Court's decision becomes final. Sec. 301.6213-1(a)(2), Proced. & Admin. Regs. We may determine whether a deficiency exists for the Bells for 2008 because the notice of deficiency was issued before the expiration of the three-year period set by section 6501(a).

B. MBA

MBA's petition also asserts that the statute of limitations bars respondent from assessing or collecting any deficiency for 2008. MBA's 2008 return was mailed on March 14, 2009, and received on March 22, 2009. The 2008 return was due, and deemed filed, on March 15, 2009. The notice of deficiency, sent via certified mail on February 7, 2012, was issued before the expiration of the three-year period of limitations on assessment. See secs. 6501, 6213; sec. 301.6213-1(a)(2), Proced. & Admin. Regs. Accordingly, we may determine whether a deficiency exists for MBA for 2008.

[*9] II.  Whether the Bells' Transfer of Realty World MBA's Assets to MBA Was a Capital Contribution Subject to Section 351

The Bells and MBA contend that the transfer of the sole proprietorship's assets to MBA was a sale and must be treated as such for tax purposes. Respondent asserts that, in substance, the transaction was a capital contribution. Deciding these cases on the basis of the preponderance of the evidence, we agree with respondent and hold that the transfer of assets to MBA was a capital contribution governed by section 351.

A.  Substance Over Form

The substance of a transaction, not its form, is controlling for tax purposes. Gregory v. Helvering, 293 U.S. 465, 469-470 (1935).  Transfers between related parties, such as Mr. Bell and MBA, are subject to close scrutiny but do not necessarily lack economic substance.  Hardman v. United States, 827 F.2d 1409, 1412 (9th Cir. 1987); Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548.  We must determine whether the transfer was a capital contribution or a sale creating a debtor-creditor relationship.

When an overall plan is accomplished through a series of steps, we must evaluate the plan, not each step, for tax purposes.  D'Angelo Assocs., Inc. v. Commissioner, 70 T.C. 121, 129 (1978) ("Where a series of closely related steps

**[*10]** are taken pursuant to a plan to achieve an intended result, the transaction must be viewed as an integrated whole for tax purposes."). The sole purpose of MBA's organization was to incorporate Mr. Bell's sole proprietorship. The inseparable relationship between MBA's organization and the transfer of the sole proprietorship's assets weighs in favor of finding that the transfer was a capital contribution, particularly in the light of the lack of evidence of a business reason for dividing the transaction. See id. at 129-131; Nye v. Commissioner, 50 T.C. 203, 211-212 (1968).

Absent a stipulation to the contrary, an appeal in these cases would lie to the Court of Appeals for the Ninth Circuit. See sec. 7482(b)(1)(A) and (B), (2); Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). That Court of Appeals applies an 11-factor test to determine whether a shareholder's transfer to a corporation is a sale or a capital contribution. Hardman, 827 F.2d at 1411-1412; A. R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970). No single factor is controlling, and the facts and circumstances of each case must be taken into consideration. Hardman, 827 F.2d at 1412. The primary purpose of the factors is to help the Court determine the parties' intent "through their objective and subjective expressions." Am.

**[\*11]** <u>Underwriters, Inc. v. Commissioner</u>, T.C. Memo. 1996-548, slip op. at 15.
We examine each factor below.

### 1. Title of Debt Instrument

The issuance of a note evidences debt, and the issuance of stock indicates an
equity contribution. <u>Hardman</u>, 827 F.2d at 1412. Mr. Bell and MBA executed a
purchase agreement transferring the sole proprietorship's assets to MBA for
$225,000. The purchase agreement provides that the purchase price was to be
paid in installments of $10,000 or more on the first of each month. The unpaid
principal amount was subject to interest at the annual rate of 10%. In <u>Hardman</u>,
the court noted that the document at issue included wording typically contained in
a promissory note and did not include wording typically contained in a stock
certificate. <u>Id.</u> Similarly, the wording in the purchase agreement is typical of a
promissory note, and it does not contain wording commonly included in a stock
certificate. This factor weighs in favor of finding that the transaction was a sale.

### 2. Maturity Date

A fixed maturity date is evidence that a debt exists because it requires
fulfillment of the financial obligation at a specific time. <u>NA Gen. P'ship & Subs.
v. Commissioner</u>, T.C. Memo. 2012-172. The lack of a fixed maturity date,
however, indicates that payment is linked to the success of the business and is

[*12] evidence of an equity interest.  Hardman, 827 F.2d at 1413.  The purchase agreement requires monthly payments of at least $10,000 on the first of each month.  While the purchase agreement does not specifically state the date that the final payment would be made, it does require that repayment be made no later than a fixed date.  This factor weighs in favor of finding that the transaction was a sale.

        3.  Payment Source

Payments that depend on earnings or come from a restricted source indicate an equity interest.  Id.; NA Gen. P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172.  The purchase agreement has no caveats regarding payment of the purchase price.  On its face, the payments were due even if MBA was not profitable.  This interpretation is supported by evidence presented by the Bells indicating that one of the benefits of structuring the transfer of Realty World MBA's assets to MBA as a sale was that they would receive a steady stream of income each month "for several years until the purchase price was paid off without concern for [the] ups and downs of the business world."  However, we cannot ignore common sense in making our analysis.

MBA acquired essentially all of its assets, which had very little, if any, liquidation value, in exchange for the promise of repayment in the purchase agreement.  Without income it would be impossible for MBA to make any

**[*13]** payments due under the purchase agreement, and repayment was completely contingent on MBA's earnings. Consequently, this factor weighs in favor of finding that the transfer was a capital contribution.

### 4. Right To Enforce Payments

The right to enforce payment of principal and interest is evidence of a debt. NA Gen. P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172. MBA did not provide any security in connection with its promises to pay. While the lack of security generally indicates an equity interest, it can be less important in transactions between related parties. See, e.g., Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548. When the transfer occurred, MBA had very little capital and no history of repayment. If MBA had failed to pay, Mr. Bell's recourse would have been limited to seeking to enforce the repayment obligations in the purchase agreement. In the light of the facts, we find that the lack of a security agreement and Mr. Bell's recourse in the event of MBA's nonpayment weigh in favor of finding that this transaction was a capital contribution.

### 5. Participation and Management

An increase in a shareholder's interest in a corporation as the result of a transaction indicates an equity interest. Hardman, 827 F.2d at 1413; NA Gen.

[*14] P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172.  MBA had no shareholders when the purchase agreement was signed, and the Bells subsequently became MBA's sole shareholders.  The transaction did not affect Mr. Bell's ownership interest.  This factor is neutral.

### 6.  Status in Relation to Other Corporate Creditors

Subordinating the right to repayment to rights of the corporation's other creditors generally indicates an equity interest.  Hardman, 827 F.2d at 1413; NA Gen. P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172.  The purchase agreement does not expressly subordinate Mr. Bell's right to repayment to rights of other creditors, and there is no evidence that it was in fact so subordinated.  Consequently, this factor is neutral.

### 7.  Parties' Intent

While all 11 factors are intended to help the Court discern the parties' intentions, this factor focuses exclusively on objective evidence of whether the parties intended for the transfer to create debt or an equity interest.  Hardman, 827 F.2d at 1413; NA Gen. P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172; Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548.  It is clear from the parties' evidence that the Bells intended to sell the sole proprietorship's assets to MBA.  The wording in the purchase agreement is similar to that typically found

[*15] in a promissory note, and the transaction was reported as a sale for tax purposes. This factor weighs in favor of finding that the transfer was a sale.

### 8. Corporation's Capitalization

Thin capitalization tends to indicate that a transaction is a capital contribution. Hardman, 827 F.2d at 1414; Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548. A corporation's debt-to-equity ratio is determined by comparing all of a corporation's liabilities to the shareholders' equity. Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548. When the purchase agreement was executed, MBA had no assets because the Bells' $500 capital contribution was not made until on or after October 15, 2008. Even if the Bells' cash contribution had been made before the execution of the purchase agreement, MBA's capitalization would have been extremely thin. MBA's inadequate capitalization is an indication that the transaction was a capital contribution.

### 9. Identity of Interest

Advances made by shareholders in proportion to their stock ownership indicate a capital contribution. Hardman, 827 F.2d at 1413; NA Gen. P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172; Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548. "A sole shareholder's advance is more

**[\*16]** likely committed to the risk of the business than an advance from a creditor who is not a shareholder." NA Gen. P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172, slip op. at 34. The transaction took place between MBA and Mr. Bell. The fact that Mr. and Mrs. Bell later became MBA's sole shareholders indicates a capital contribution.

### 10. Interest Paid Only With E&P

This factor considers the source of interest payments and is effectively the same as the third factor. Hardman, 827 F.2d at 1414. An obligation to pay, and payment of, a fixed rate of interest is an indication of debt. NA Gen. P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172. The purchase agreement provides that interest shall accrue on the unpaid principal at the annual rate of 10%. Though the purchase agreement does not condition the payment of interest on the corporation's having E&P, payment of interest would be possible only if MBA generated income. This factor weighs in favor of finding that the transaction was a capital contribution.

### 11. Ability To Obtain Loans From Other Sources

The corporation's ability to borrow funds from a third party indicates a debt. Hardman, 827 F.2d at 1414; NA Gen. P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172. "If no reasonable creditor would have sold property to the

[*17] corporation with payments to be made in the future, an inference arises that a reasonable shareholder would not do so either." Hardman, 827 F.2d at 1414. There is no evidence in the record as to whether MBA would have been able to obtain a loan from a third party. MBA was a newly organized, thinly capitalized business. We do not believe that an arm's-length creditor would have been willing to lend MBA $225,000 on terms and conditions the same as those in the purchase agreement. This factor weighs in favor of finding that the transaction was a capital contribution.

Some of the above 11 factors are neutral, others weigh in favor of finding that the transaction created a debtor-creditor relationship, and others favor finding that it created an equity interest. Considering all of the factors together, we believe that they weigh in favor of finding that the transaction was in substance a capital contribution.

B.  Whether Section 351 Governs the Tax Consequences of the Transaction

Section 351(a) provides:  "No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control * * * of the corporation."  Person(s) have control if they own stock possessing at least 80% of:  (1) the total combined voting power of all of the

[*18] corporation's voting stock and (2) the total number of shares of all of the corporation's other classes of stock. Sec. 368(c). The application of section 351 is mandatory if all of the requirements are met. Nye v. Commissioner, 50 T.C. at 209.

In substance, in order to incorporate Mr. Bell's existing business, the Bells transferred $500 in cash and all of the sole proprietorship's assets to MBA solely in exchange for MBA's stock. The Bells were in control of MBA immediately after the transfer of cash because they became MBA's sole shareholders. Thus, section 351 governs the tax consequences of this transaction.

III.  Tax Consequences to the Bells

A.  Completed Contract Purportedly Transferred to MBA

Accounts receivable may be transferred to a newly formed corporation in a section 351 transaction. See Hempt Bros., Inc. v. United States, 490 F.2d 1172 (3d Cir. 1974); Rev. Rul. 80-198, 1980-2 C.B. 113. However, it is a longstanding principle that income must be taxed to the one who earns it, and attempts to assign income to another entity are not recognized for Federal tax purposes. See Lucas v. Earl, 281 U.S. 111 (1930).

The sale of property subject to 1 of the 40 contracts that was purportedly sold to MBA closed on September 1, 2008, and the $10,800 payment was received

[*19] on September 3, 2008. Because payment was received before the date that the contract was transferred to MBA, it cannot be construed as an "account receivable" for purposes of section 351. The Bells should have included the $10,800 in their income.

### B. Dividends

Money distributed to a shareholder out of a corporation's E&P is considered a dividend and shall be included in gross income. Secs. 301(a), (c), 316, 317(a). To the extent that a corporation has E&P, they are generally considered the source of corporate distributions. Sec. 316(a). Since we have determined that the Bells' transfer of the sole proprietorship's assets to MBA was a capital contribution, MBA's payments to the Bells in the years at issue must be treated as distributions, not installment payments. Because MBA's E&P in each of these years exceeded the amount distributed to the Bells, the distributions should be treated as dividends for tax purposes.

## IV. Tax Consequences to MBA

MBA's initial basis in all of the property it received in connection with the section 351 transaction was the same as the Bells' basis in the property. See sec. 362(a). In addition to the amount MBA paid to renew the franchise license agreement, MBA will assume Mr. Bell's basis in the franchise license agreement.

**[*20]** On the basis of the evidence presented, it appears that the Bells had no basis in the transferred contracts or goodwill.  Pursuant to section 362(a), because MBA has no basis in these items they may not be depreciated or amortized.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>pursuant to Rule 155</u>.